**CIGNA FIRE UNDERWRITERS COMPANY, et al., Plaintiffs, Appellees, Cross–Appellants,**

v.

**MacDONALD & JOHNSON, INC., Defendant, Appellant, Cross–Appellee.**

Nos. 95–1061, 95–1145, 95–1570 and 95–1648.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1995.

Decided June 28, 1996.

---

John B. Stewart, with whom Edward V. Leja and Moriarty, Donoghue & Leja, P.C., Springfield, MA, were on brief, for CIGNA Fire Insurance, et al.

F. Michael Joseph, with whom Joseph, St. Clair & Cava, Springfield, MA, was on brief, for MacDonald & Johnson, Inc.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOWNES, Senior Circuit Judge.

Before us are appeals by both parties after two jury trials. CIGNA Fire Insurance Company ("CIGNA") is a large insurance conglomerate. MacDonald & Johnson, Inc., ("M & J") is an independent insurance agent that sold, *inter alia*, CIGNA insurance. CIGNA sued M & J for breach of contract alleging failure to remit insurance premiums due it by M & J. M & J brought a counterclaim against CIGNA alleging: breach of contract; intentional interference with contractual relations; intentional interference with economic gain; and violation of Mass. Gen. L. ch. 93A, § 11, and 93A generally.

After a four-day trial, the jury returned special verdicts:

Judgment for the defendant on plaintiffs' claim of breach of contract.

Judgment for the defendant against the plaintiffs on its counterclaim alleging breach of contract with damages awarded in the amount of $780,000.00.

Judgment for the defendant against the plaintiffs on its counterclaim alleging interference with contractual relations with damages awarded in the amount of $500,000.00.

Adding interest, the total award to M & J came to $1,544,106.73.

The district court found for CIGNA on M & J's claimed violations of Mass. Gen. L. ch. 93A.

After a hearing, the district court set aside the jury verdict and ordered a new trial.

After another four-day trial the second jury found in favor of M & J and awarded it damages in the amount of $250,000.00. Judgment for M & J, including interest, came to $321,333.28. Early in the second trial, the district judge, based on a stipulation by the parties, ruled that M & J had breached its contract with CIGNA and that the amount due CIGNA was $169,798.14. Adding interest to this resulted in a judgment for CIGNA in the sum of $219,888.60. The judge denied both parties' post-trial motions.

Before starting our exposition of the evidence and analysis of the issues, we state the standard of review that controls our assessment of the district court's decision to set aside the jury verdicts and order a new trial in the first case and decline to do so the second time around. Fed.R.Civ.P. 59(a) provides in pertinent part:

(a) **Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States;

The Court has described the scope of the rule as follows:

The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in

admission or rejection of evidence or instructions to the jury.

Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).

First Circuit precedent is clear.

A district court may set aside a jury's verdict and order a new trial only if the verdict is so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice. See, e.g., Lama v. Borras, 16 F.3d 473, 477 (1st Cir.1994). A trial judge's refusal to disturb a jury verdict is reversed only for abuse of discretion.

Federico v. Order of Saint Benedict in Rhode Island, 64 F.3d 1, 5 (1st Cir.1995). See also Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 552 (1st Cir. 1995).

There can be no doubt that the district court here understood the constraints applicable to setting aside a verdict and ordering a new trial. The new trial ruling states, inter alia:

A jury verdict may not be set aside as a matter of law under Fed.R.Civ.P. 50(b) except on a "determination that the evidence could lead a reasonable person to only one conclusion." Acevedo–Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir.1993) (quoting Hiraldo–Cancel v. Aponte, 925 F.2d 10, 12 n. 2 (1st Cir.1991)).

## I.

### ISSUES COMMON TO BOTH TRIALS

The evidence adduced at both trials was essentially the same. CIGNA has raised two issues on appeal which are common to both trials:

(1) Whether the district court erred in refusing to grant its motions for judgment as a matter of law on M & J's breach of contract claim at the conclusion of both trials.

(2) Whether the district court erred in ruling that M & J's claims "were not barred or diminished" for its failure to exhaust its administrative remedies provided under Mass. Gen. L. ch. 175, § 163.

### Submission of M & J's Breach of Contract Claim to the Jury

The question, of course, is whether there was sufficient evidence for M & J's breach of contract claim to be decided by the juries. The relevant evidence which was substantially the same for both trials is summarized as follows. Frank Lombard, president and owner of M & J, testified that M & J encountered serious financial problems when the Bank of New England collapsed causing M & J's line of credit to terminate on May 30, 1991. Lombard testified that it was usual for M & J, and other insurance agencies, to use bank loans to meet its premium obligations to insurance companies for premiums owed by the insureds. In other words, the agency would carry its clients by borrowing money from a bank, pay the premiums due the company and wait for payments from the clients. The collapse of the Bank of New England stripped M & J of any cash reserves. Lombard testified that other insurance companies with whom M & J did business agreed to accept monthly installment premium payments or extended the due date for the payment of premiums.

Another factor that impacted on M & J's financial condition was the loss of its biggest insurance account, F.L. Roberts Co. ("Roberts"). Premiums on this account amounted to between $800,000.00 and $1,000,000.00 a year. Roberts was a large wholesaler and retailer of petroleum products and operator of service stations and car washes in southern New England.

The evidence discloses the following sequence of events. Lombard was an insurance consultant for Roberts, not an agent, from 1979 through 1986. In late 1986, Roberts did not have a carrier for 1987. Lombard suggested that Roberts try to obtain insurance coverage for a three-year period with the premiums being determined on the basis of the carrier's expenses and Roberts' losses. Under such a program the insured, who paid a deposit premium initially, might be owed refunds by the carrier at the end of the insurance year or vice versa. The amount due either the carrier or Roberts would be determined each year. In January of 1987, such a program was entered into

between Roberts and CIGNA for three years with M & J acting as agent. The amount of premiums due would be determined in September 1988, 1989, and 1990. In July or August of 1990 Lombard calculated that CIGNA owed Roberts $200,000.00 under the program. He contacted CIGNA on September 30, 1990, and was told that it would look into it. Lombard called the CIGNA department in charge of the program and was reprimanded for doing so. A new program was set to go into effect in January of 1991. The down payment required by CIGNA from Roberts was $250,000.00. Roberts informed Lombard that it would not pay the $250,-000.00 unless it was credited with the $200,-000.00 refund. Laurie Scanlan, who worked in the special risk division of CIGNA, acknowledged that CIGNA owed Roberts money under the program, but would not pay it because she asserted that Roberts also owed a surcharge of $56,000.00. Lombard told Scanlan the surcharge was not part of the insurance program. She told him to collect it. He refused.

An inter-office CIGNA memo states its position:

Per our discussion, the following strategy will be utilized in solving the F.L. Roberts FVC surcharge dispute.

Number one, Insured Meeting. Set up a meeting with F.L. Roberts and invite the agent.

Number two, Program Intent. Discuss the need for the surcharge in vague terms. Provide the proposal for the '89 and '90 years to document the stated surcharge, in parentheses, '87 and '88: FVC not mentioned. Close parentheses.

Number 3, CIGNA's Needs. If we cannot collect the surcharge, we cannot be a market for such coverages.

Number 4, Payment Intentions. After discuss needs for surcharge, determine if F.L. Roberts is willing to pay the FVC surcharge.

Number five, Refusal to Pay. Legally, we cannot enforce the payment of the FVC surcharge. Therefore, back-off if they refuse to pay. But we should then seriously consider non-renewal.

Hopefully, we can satisfy our insured and collect the surcharge at the same time. Good luck.

M & J expected a proposal from CIGNA for the 1992 Roberts insurance program. Scanlan was supposed to work up the figures. Lombard received a letter from Scanlan on December 16, stating that CIGNA would not negotiate renewal terms unless CIGNA was paid the 1991 premiums due. The letter further stated that CIGNA would issue cancellation notices the next day, but if Roberts paid CIGNA within ten days, the notices would be rescinded. Roberts' insurance was cancelled as per the letter. Lombard immediately faxed to CIGNA a statement by CIGNA showing a credit due Roberts of $28,-903.58 as of December 20, 1991. After the fax, CIGNA reinstated Roberts' insurance.

CIGNA sent a renewal proposal for 1992 that cost about $500,000.00 more than the prior program. Lombard was given until noon the next day to make up his mind. He found the proposal totally unacceptable. Lombard tried to work out an alternative program with CIGNA. With the permission of Joann White of CIGNA, he issued temporary binders effective January 1, 1992. Scanlan notified Roberts that the temporary policies were not valid. Lombard received a letter from Scanlan that a new agent, Palmer Goodell Insurance, would be Roberts' new broker unless Lombard was notified otherwise by the close of business on January 17. No such notification was received. M & J's commissions on the Roberts account amounted to about $80,000.00 per year.

The third aspect of the evidence involved two unexecuted promissory notes from M & J to CIGNA. As M & J's financial problems increased, it approached CIGNA and asked to pay the premiums due in twelve regular monthly installments. CIGNA told M & J in September of 1991 that it would draw up a promissory note providing for payment of the past due premiums in regular monthly installments. The note was brought to Lombard by Charles Glaser on February 6, 1992. Lombard approved it orally, but did not sign it because the word "draft" was written across the top of it. This note had a principal sum of $115,507.05. During his discus-

sion with Glaser, Lombard told him about the Roberts account. Glaser asked Lombard what he was planning to do. Lombard replied, "I don't know, I'm seeking a legal remedy." A second note was presented to Lombard on March 23 by Robert Purdy. The principal was $105,324.14, but the payment terms and interest were the same as the first note.[1] This note, however, included a waiver and release of all claims that M & J might have against CIGNA. Lombard, still smarting because of the loss of the Roberts account, refused to sign the note. Remmy Martens, a marketing official for CIGNA, who had dealt with Lombard for an appreciable length of time, told Purdy at the time the waiver and release were added to the note that, based on his knowledge of Lombard, Purdy would have difficulty getting Lombard to sign the note as redrafted.

CIGNA cancelled its agency contract with M & J forthwith after Lombard refused to sign the note. It shut down all of M & J's computers wired into the CIGNA net. It put all of the policies heretofore handled by M & J on direct billing; i.e., premiums were paid directly to CIGNA.

M & J notified CIGNA that the forthwith cancellation was prohibited by Massachusetts law, which it was. Mass. Gen. L. ch. 175, § 163 prohibits the cancellation of an agency contract without 180 days notice.[2] After CIGNA checked the Massachusetts statute, it deferred the cancellation for 180 days.

We rule that there was sufficient evidence from which a jury could find that CIGNA breached the agency contract with M & J. The evidence provided two grounds for such a finding. One, that the "forthwith" cancellation was contrary to Massachusetts law, of which CIGNA must be presumed to have knowledge. It also could be found that CIGNA cancelled its agency contract with M & J by refusing to honor the binders that one of its officials (White) had authorized.

1. There is no explanation in the record as to the difference between the principal in each note.

2. No company shall cancel the authority of any independent insurance agent for fire or casualty insurance, or both, if said agent is not an employee of said company and no company

*The Application of Mass. Gen. L. ch. 175, § 163*

This issue does not merit extended discussion. CIGNA claims "that the unexhausted administrative remedy available under M.G.L. ch. 175, Sec. 163 eclipsed or diminished M & J's claim for damages." CIGNA brief at 37. First, we do not understand what the terms "eclipsed or diminished" mean in the context of this case. The statute provides in pertinent part:

> Except as otherwise provided herein, any agent receiving notice of such cancellation, modification or expiration *MAY*, within fifteen days after receipt thereof, make a written demand for reference to three referees of the question as to whether or not such cancellation, modification or expiration will so affect the renewal, continuation or replacement of any policies placed with the company through the efforts of the agent, or the services needed by any policyholder doing business with the company as a result of the efforts of the agent, as to justify renewal or continuation of any policies then in effect having been placed with such company by such agent.

(Emphasis added.)

It cannot be reasonably doubted that the statute is permissive. M & J had no duty to invoke it.

CIGNA has cited no cases holding even tangentially that the statute applies in a situation similar to the one that confronts us. The two cases it cites are completely inapposite; they involve different statutes and different claims. We have been unable to find any cases in this Circuit or in Massachusetts requiring an agent to invoke Mass. Gen. L. Ch. 175 § 163 prior to asserting claims against an insurance company, and CIGNA has cited none. CIGNA's argument is without merit.

shall modify a contract with such an agent unless the company gives written notice of its intent to cancel such agent or its intent to modify such contract at least one hundred and eighty days before the proposed effective date of any such cancellation or modification.

## II.

### THE FIRST TRIAL

The district court ordered a new trial for three reasons. It ruled that the jury finding that M & J had not breached its contract with CIGNA to pay premiums as due "is against the clear weight of the evidence and enforcing it would result in a miscarriage of justice." The court found that the jury "rendered an improper 'sympathy' verdict."

The court found that the amount awarded M & J on its breach of contract claim was "outrageous." It held that M & J "failed to introduce evidence at trial that established its entitlement to over $700,000 in damages."

The court set aside the jury verdict awarding $500,000.00 to M & J for intentional interference by CIGNA with M & J's contractual relations with Roberts. It ruled: that "there was no evidence of a contract between M & J and Roberts;" that "even if there was a contract ... there was no evidence that CIGNA knowingly induced Roberts to break that contract," and that M & J failed to show that even if there was a contract and interference with it by CIGNA, M & J "failed to show that CIGNA's interference was improper in motive or means."

The court concluded:

> In fine, after considering the jury's verdict in conjunction with its ruling on CIGNA's breach of contract claim, above, the Court surmises that the jury's decision on the MacDonald & Johnson breach of contract claim "could only have been a sympathy" verdict. See Phav v. Trueblood, Inc., 915 F.2d at 767. In addition, because the issues of liability and damages are so interwoven both issues must be re-tried.

M & J, as would be expected, objects strenuously to the district court's rulings and findings. We discuss them seriatim.

### The Jury Verdict that M & J did not Breach its Contract with CIGNA

■ The question is, could the evidence lead a reasonable person to only one conclusion. *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir.1993). We think so. As the district court pointed out in its memorandum opinion, the evidence was clear and not disputed by M & J that it owed CIGNA about $111,000.00 in premiums. This evidence came not only from CIGNA but from the testimony of John Januska, the comptroller and assistant treasurer of M & J. He stated that there was no question that $111,000.00 was due CIGNA in July of 1991. And although strictly speaking it was not evidence, counsel for M & J told the jury in his opening statement that premiums due CIGNA had not been paid.

In its appellate argument, M & J seeks to shift the focus from the agency contract to the unexecuted promissory notes. It contends that the notes constituted a modification of the agency contract and that both parties agreed to payment of the overdue premiums in monthly installments. Lombard testified that he agreed to the terms of the first note and that CIGNA did also. CIGNA says that the first note was only a tentative proposal for Lombard's consideration and therefore the note was not signed by the parties. Lombard refused to sign the second note, the one with the added waiver and release. Lombard's assumption that he would be given an opportunity to pay the premiums owed CIGNA in monthly installments may have caused him not to pursue other options for payment, but it is not a valid basis for finding either a modification of the agency contract or a new contract between the parties. Such a finding is foreclosed by the two unexecuted promissory notes. The district court did not err in ruling that the jury's verdict was contrary to the evidence and upholding it would result in a miscarriage of justice.

Moreover, there is another reason for upholding the district court on this issue. Early in the second trial the parties stipulated that judgment would be entered for CIGNA against M & J on CIGNA's breach of contract claim in the amount of $169,798.14 plus interest. By so doing, M & J waived any objections to CIGNA's contract claim in the first trial.

### The Amount of Damages Awarded on M & J's Breach of Contract Claim Against CIGNA

■ The jury awarded M & J $780,000.00 on its breach of contract claim. The court

set this aside because M & J's evidence failed to establish that it was entitled to over $700,000.00 in damages and because it was a "sympathy" verdict. Lombard estimated that he lost a little over $200,000.00 as a result of the termination of the agency contract by CIGNA. He managed to salvage $30,000.00 to $40,000.00, making a net loss of $160,000.00. In addition, Lombard testified that he lost $161,158.00 on his commercial accounts, $39,046.00 on "Market Dyne" Business, and a $215,490.00 loss was sustained on personal accounts. The loss of commissions on the Roberts account came to $80,000.00, and there was a loss of profit sharing with CIGNA amounting to $44,000.00. Lombard testified that his salary dropped about $60,000.00 a year after the CIGNA termination. These figures, even if taken at face value and with no allowance for what appears to be double counting, total $699,694.00, not including the reduction in Lombard's salary. The suit was brought in the name of M & J so we do not think that Lombard's reduction in salary is a proper item to be considered. Thus, the total amount of damages, taking Lombard's testimony at face value, did not, as the district court pointed out, exceed $700,000.00.

It was not error for the district court to set aside as excessive the breach of contract damages awarded M & J. We point out that the court found that the verdict on damages for M & J was infected by the jury's complete disregard of the evidence on CIGNA's breach of contract claim. This appears to be a sensible assessment of the first jury's verdict. The second jury was not so influenced.

### The Jury Award of $500,000.00 for CIGNA's Intentional Interference with M & J's Contractual Relationship with Roberts

The district court correctly applied Massachusetts law to a claim for intentional interference with contractual relations. The party making the claim must prove four elements: (1) that there was a contract with a third party; (2) that defendant knowingly induced that party to break the contract; (3) that defendant's interference was intentional and improper in motive or means; and (4)

that the claimant was harmed by defendant's action. *Wright v. Shriners Hospital for Crippled Children,* 412 Mass. 469, 476, 589 N.E.2d 1241, 1245 (1992); *see also G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363, 1369 (1991); *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812, 551 N.E.2d 20, 21 (1990).

Our reading of the record confirms the ruling of the district court that there was no contract between Roberts and M & J. A long-standing business relationship does not become a contractual relationship automatically, as M & J seems to argue. The last insurance program issued to Roberts by CIGNA through M & J was for a term of three years. None of the parties had a contractual obligation to continue the insurance coverage after its term expired. The evidence suggests strongly that Roberts decided to use a broker other than M & J because it would be less expensive. There was also evidence that one of the owners of the new agency was a neighbor of the president of Roberts. We need go no further than the lack of a contract between Roberts and M & J to uphold the ruling of the district court setting aside the jury verdict awarding M & J $500,000.00 for intentional interference with a contractual relationship by CIGNA.

At the trial the court reserved to itself the decision on the claim by M & J against CIGNA for violations of Mass. Gen. L. ch. 93A. It found in favor of CIGNA. M & J moved for a new trial. Our review of the record reveals no basis for reversing the judgment of the district court. We do not find it necessary to delve into the nuances of chapter 93A law. Suffice it to say that the sparsity of the evidence was a firm basis for the court to conclude that M & J had failed to meet its burden of proof on its 93A claims.

### Denial of M & J's Motion to Amend Count III of its Counterclaim

This issue requires some exposition. Count III of M & J's counterclaim was entitled, "Intentional Interference with Economic Gain." In a pretrial memorandum and order dated February 17, 1993, the district court said:

Defendant's third counterclaim against CIGNA admittedly is mislabeled, but this problem is not fatal. The Court will interpret the cause of action as one for intentional interference with advantageous business relations, a claim recognized by the Massachusetts courts.[2] Here, too, defendant has pleaded the requisite elements.

The footnote stated: "Defendant shall amend its counterclaim within ten days, substituting the correct nomenclature." Inexplicably, M & J did not amend the counterclaim as ordered.

At a pretrial conference on the day the trial started, the court pointed out to M & J's counsel that the counterclaim had not been amended as ordered. The attorney said: "I thought that was right in there." The court replied, "No." The judge's law clerk then said, "According to the documents, that was never filed." The attorney responded by saying, "Okay." No objection was taken nor was permission requested to amend the counterclaim *nunc pro tunc.*

After the conclusion of the trial, M & J moved to amend its counterclaim. The motion was denied as untimely, but the court said:

> In the event that this case is re-tried, the Court will reconsider MacDonald & Johnson's request to amend its pleadings to include a claim for intentional interference with advantageous business relations.

Six days prior to the second trial, M & J filed a motion to amend their counterclaim to include a claim for intentional interference with advantageous business relations. The court denied the motion on timeliness grounds, also noting that the pleadings failed to allege facts to support the claim, that CIGNA presented no evidence at the first trial (nor offered any at the second) to support the inference that CIGNA knowingly induced Roberts to break its contract with M & J or that any interference by CIGNA was improper.

 We review a denial of leave to amend for abuse of discretion. A district court, in denying such leave, may properly consider a party's undue delay, repeated failures to cure deficiencies in the pleadings, and the futility of the proposed amendment. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Without deciding whether CIGNA had presented evidence at the first trial sufficient to enable a jury to find an intentional interference with advantageous business relations, we hold that the district court acted within its discretion in denying the motion to amend.

The district court told M & J before the first trial that its complaint should be amended if M & J wanted it considered; M & J failed to do so. It was proper for the judge to deny leave to amend after the first trial where counsel was instructed to amend the complaint, failed to do so, and failed to correct this error when it was pointed out by the court. Having left an opening for M & J to try again, the court could well find that M & J had failed to exercise proper diligence because it waited virtually until the eve of trial before submitting its motion to amend. Under these circumstances, we will not disturb the ruling of the district court.

### The Second Trial

As already explained, the second jury trial was limited to M & J's breach of contract claim against CIGNA. M & J moved for a new trial, which was denied. Both parties object to the damages award so we start with that.

### Damages

 CIGNA attacks the damages on two grounds: that the evidence should not have been admitted because it was based on hearsay and speculation and that the award was too high. M & J asserts that the award was too low because the court improperly limited M & J's damages to the period from the initial date of cancellation of the agency contract, to October 15, 1992, the extended date of cancellation required under Massachusetts law.

Before discussing the claims of the parties, we rehearse the evidence on damages as reported in the second trial transcript. The evidence on damages came in through the testimony of Frank Lombard. He testified essentially as follows. Up to 1992, M & J's

average commissions on premiums it received was "in the $250,000 a year range." After the cancellation, clients of M & J who were insured by CIGNA were sent letters notifying them that M & J's contract with CIGNA had been cancelled and all premiums due were to be paid directly to CIGNA. Most of these clients did not renew their policies with M & J. Lombard kept a record of all such clients. From the date of the initial cancellation, April 2, 1992, to October 15, 1992, premiums from the affected clients aggregated $1,720,495.00; M & J's loss in commissions totalled $201,294.00. This was broken down into three categories: commercial commissions—$175,138.00; Market Dyne commissions—$13,281.00; and personal commissions—$12,875.00. In addition, M & J lost its annual profit sharing income from CIGNA of $12,871.00. Lombard further testified that the commission loss to the end of the year would have been $215,393.00.[3] Lombard testified that loss of commissions was the same as loss of profits and that M & J had a renewal rate of 93% on insurance policies purchased through it.

He started to testify about future loss of profits when there was an objection followed by a bench conference. The court reminded counsel for M & J that it had limited damages to October 15, 1992. M & J's counsel made an offer of proof that damages would be $215,000.00 in lost commissions a year plus loss of profit sharing of $56,000.00 for a total of $271,000.00 a year "ad infinitum."

■ We start our analysis of M & J's objection to the court's ruling on damages with the observation that it is obvious that an "ad infinitum" claim for damages has no basis in law and confounds common sense. Confining our analysis, however, to the claim by M & J that the court's ruling that no damages could be awarded after October 15, 1992, was error, we point out that the transcript of the jury instructions shows that no such instruction was given. The court left it entirely up to the jury to determine the period of time for which damages could be awarded:

In considering any claim for loss of anticipated profits resulting from a breach of contract, you should consider the length of time that parties had a right to expect to receive the benefits of the contract.

If you determine the contract was only for a certain period of time, or could be terminated by notice to the other party after a certain period, you may only award damages for losses incurred during that limited period of time.

CIGNA did not object to the failure of the court to limit the time period for awarding damages.

M & J argues that this unexpected *volte-face* by the court on damages prevented it from introducing more extensive evidence on damages. The answer to this is that Lombard testified: "Your [sic] damages are, our loss of commission both for 1992, and these people, based on our experience, would have renewed their insurance each year and these customers are gone." It is hard to see what additional evidence could have been introduced. This sum of $271,000.00 for annual lost profits was in evidence for the jury to consider and there was no restriction in the charge limiting the period of damages. We have read the final argument for M & J carefully and there is no discussion in it of any time-period limitations on damages. The attorney for M & J, without objection, stated, "a whole year's commission was $215,000, not 201." Based on the evidence before the jury and the court's instructions, we find that M & J was not prejudiced by the court's bench ruling that damages could not be awarded after October 15, 1992, because this ruling was not conveyed to the jury.

■ We are not impressed by CIGNA's objections that the evidence on damages was based on speculation and hearsay and should have been excluded. As the court pointed out, Lombard's testimony was based on his own records and experience in the insurance business. That the testimony was self-serving went to its credibility not its admissibility. Lombard was subjected to rigorous cross-examination on damages and CIGNA introduced testimony through experts that contradicted Lombard's testimony. The

---

**3.** These amounts are considerably lower than the items of damages claimed in the first trial.

jury's verdict of $250,000.00 in damages for M & J strikes us as a reasonable assessment of the evidence. Moreover, even if Lombard's testimony was hearsay in part, it did not affect the verdict. The $250,000.00 award could only have been for the year 1992. As to what happened to M & J's clients in 1992, Lombard had first-hand information. He testified as follows:

> A. I kept track from the day this event occurred in March of 1992. I was the one in charge. I was the one that talked to the people that got the letter from CIGNA. I was the one that handled all the commercial accounts, so I knew who was affected by that action.

Any violation of the hearsay rule was *de minimis.*

CIGNA's other objection that the award was too high does not fare any better. CIGNA argues that Lombard testified only as to lost revenues but ignored the other side of the ledger—savings in ongoing expenses—thus, the damages were higher than what normally would be the case. Lombard did testify specifically, however, that M & J's expenses did not contract after the loss of the Roberts account but continued at the same level. He testified that no one was terminated, and that expenses continued at the same rate. Lombard was cross-examined intensively on this point but did not give ground. It was well within the province of the jury to believe Lombard's testimony.

Our rulings and findings on damages negate CIGNA's argument that its motion for a remittitur should have been allowed.

### The Conduct of the Judge

M & J's main attack on the jury verdict is a two-pronged condemnation of the conduct of the district judge. It asserts that the judge should have recused himself from presiding over the second trial because of bias and prejudice against M & J. It also accuses the judge of secretly communicating with the jury during its deliberations. These are serious charges.

### Recusal

In its motion for recusal filed prior to the second trial, M & J states three specific reasons for recusal:

1. The very nature of a retrial order is such that it should be considered by one other than the original trial judge.
2. At the pretrial conference held on March 13, 1994, Judge Freedman stated in open court that he thought that the Defendant, Plaintiff in counterclaim, Frank Lombard, was insincere.
3. At the pretrial conference held on March 13, 1994, Judge Freedman stated in open court that if a jury finds similarly on retrial, that he would order a third trial.

In its brief, M & J has expanded its reasons:

> The trial judge not only stated his bias, but allowed it to infect his rulings. As indicated in prior arguments in this brief, he took away verdicts in favor of M & J after the first trial even though there was ample evidence to support them. In ruling on these motions he denied the existence of evidence of damages which was clearly before the jury. He failed to apply proper law in finding against M & J for the claim arising out of the loss of the F.L. Roberts account. He failed to adhere to the rules of civil procedure regarding notice pending and amendments to pleadings. He found against M & J on the c. 93A count without making any findings of fact to support his decision.

M & J's Brief at 42–43.

28 U.S.C. § 455(a) provides:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

We turn to the case law to determine when the statute is implicated. In this Circuit the question is:

> whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28

U.S.C. § 455, but rather in the mind of the reasonable man.

*United States v. Arache,* 946 F.2d 129, 140 (1st Cir.1991) (quoting *United States v. Cowden,* 545 F.2d 257, 265 (1st Cir.1976), *cert. denied,* 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977)). *See also Town of Norfolk v. United States Army Corps of Eng'rs,* 968 F.2d 1438, 1460 (1st Cir.1992); *United States v. Lopez,* 944 F.2d 33, 37 (1st Cir. 1991).

■ In *In Re Allied–Signal, Inc.,* 891 F.2d 967 (1st Cir.1989), Judge Breyer, now Justice Breyer, made a number of observations that are pertinent here: The court of appeals will not reverse a district judge's decision to sit unless such decision "cannot be defended as a rational conclusion supported by a reasonable reading of the record." (quoting *In Re United States,* 666 F.2d 690, 695 (1st Cir.1981)). *Id.* at 970. He amplified:

> When considering disqualification, the district court is *not* to use the standard of Caesar's wife, the standard of mere suspicion ... that is because the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.

*Id.*

We end our case review with a quote from *El Fenix de Puerto Rico v. The M/Y Johanny,* 36 F.3d 136, 140 (1st Cir.1994).

> No permissible reading of subsection 455(a) would suggest that Congress intended to allow a litigant to compel disqualification simply on unfounded innuendo concerning the *possible* partiality of the presiding judge.

We start our analysis by noting that there is no rule of federal procedure that requires a different judge to preside over a new jury trial ordered by the original trial judge. M & J has cited no case to this effect and we have found none. Absent a Local Rule that so provides (and Massachusetts has none),

this is a matter within the discretion of the trial judge. Although there may be circumstances in which a new judge should preside over the second trial, such substitution is not the usual practice. We find nothing in the record here suggesting circumstances that would make the trial judge think twice about presiding over the new trial.

Because we have affirmed the rulings and findings of the district court setting aside the verdicts in the first trial and ordering a new trial, it would be pointless to discuss the asseverations made by M & J at pages 42 and 43 of its brief. Our affirmance of the rulings and findings of the district court scotches any bias or prejudice claim on this basis.

This leaves for consideration the comments made by the judge at the pre-trial hearing on May 13, 1994. The record reads as follows.

> THE COURT: Well, Mr. Joseph, without even thinking F.L. Roberts what is your client earnestly, sincerely and so forth believe he's entitled to on the breach of contract on the counter-claim?
>
> MR. JOSEPH: He is, believes he's entitled to the jury verdict on the counter-claim.
>
> THE COURT: $500,000?
>
> MR. JOSEPH: Oh, indeed.
>
> THE COURT: There's no way to move if that's his thinking.
>
> MR. JOSEPH: Well, that is his thinking.
>
> THE COURT: Well, if that's his thinking then you have no authority to do anything.
>
> MR. JOSEPH: Well, I have the authority.
>
> THE COURT: Then, we'll have to talk trial date and go from here.
>
> MR. JOSEPH: All right, sir.
>
> THE COURT: And I have to advise you in advance that if a second jury went as far as the first jury went as far as $500,000, the money, I'd take that away as well. You have to know you're not going to get it. I don't care what you did. At least not from this Judge. You could always take

an appeal and see if you could get another trial. That would be up to the first circuit.

MR. JOSEPH: Okay.

THE COURT: I was hoping we might be able to be sincere in our thinking and go somewhere. Your client is not sincere in my eyes.

MR. JOSEPH: Judge, I really must disagree with you and I insist my client is very sincere. Perhaps if you don't think he's sincere you should recuse yourself.

THE COURT: No, I'm saying if he thinks a jury verdict should be given to him if he's not willing to accept and go with another trial, I frankly don't think another jury would go anywhere near that figure. If they give anything at all. I'm not even convinced he, they would ever do that.

This pre-trial hearing was called by the judge in an attempt to settle the case. We see nothing in the comments of the judge that would create a reasonable doubt concerning the judge's impartiality in the mind of a reasonable person.

### The Alleged Secret Communication by the Judge with the Jury

■ M & J has alleged that the trial judge, without advising counsel, responded in the negative to a question by the jury asking whether it could award damages of more than $240,000.00 to M & J. This alleged secret communication between the judge and jury first surfaced in a conversation between Gary W. Lavallee, foreman of the jury, and Frank Lombard, president of M & J, at a local restaurant three or four weeks after verdict and judgment in the second trial. The jury foreman subsequently executed a sworn affidavit which stated:

### AFFIDAVIT OF GARY W. LAVALLEE

I am Gary W. Lavallee. My business address is 82 Main Street, West Springfield, Massachusetts.

I was the foreman of the jury in the case of CIGNA vs. MacDonald and Johnson Insurance Agency, Inc. in November 1994.

Based on our recent conversation regarding your jury award, we the jury sent two questions out to Judge Freedman requesting guidance. One question specifically asked if we could award damages over and above the $240,000 you had illustrated on the blackboard, to justify for a loss of renewal income. His reply was that we couldn't.

During our deliberation, the whole jury was in complete agreement to awarding additional damages based on loss of renewal income.

Signed under the pains and penalties of perjury this 1st day of March 1995.

/s/ Gary W. Lavallee
Gary W. Lavallee

The other question asked by the jury poses no problem. It stated in writing:

(1) Are we allowed to tack on (or provide) interest to amount of damages that MacDonald is asking for?

If so, can we charge 8%?

After consulting with counsel the judge replied in writing:

Interest cannot be added to any verdict by the jury.

Judge Freedman.

The allegation by the jury foreman of a secret communication was never squarely resolved on the merits because the district court ruled in a motion to strike the affidavit that it had been obtained in violation of an explicit rule prohibiting interviews by counsel, litigants or agents except under the supervision of the district court. *See United States v. Kepreos,* 759 F.2d 961, 967 (1st Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985). We concluded that a complete record was necessary for a fair determination of this issue and that the district court should determine whether there was any private communication as alleged by the jury and, if so, the circumstances surrounding the communication.

We, therefore, issued an order retaining jurisdiction and

remanding to the district court for the limited purpose of determining whether the alleged private communication occurred and, if so, in what circumstances.

A new district judge will be assigned by the chief judge of the district court for the limited purpose of conducting this proceeding.

Judge Douglas Woodlock was assigned by Chief Judge Tauro of the U.S. District Court of Massachusetts to conduct the proceeding. On May 2, Judge Woodlock took testimony from the jury foreman, Lavallee, two district court security officers, a deputy U.S. Marshal, and the courtroom deputy clerk to Judge Freedman during the trial.

On May 6 testimony was taken from six other jurors. One of the jurors had left the state and no attempt was made to obtain her testimony. Testimony was also taken on the same day from Frank Lombard, president of M & J, and the courtroom deputy clerk for the proceeding. At the conclusion of this evidentiary hearing; Judge Woodlock informed the parties of his intention to give Judge Freedman an opportunity to state his recollection of the allegations in the Lavallee affidavit. Counsel was advised that after reviewing Judge Freedman's statement they would have an opportunity to interrogate him.

In the meantime, counsel had advised Judge Woodlock that Judge Freedman's law clerk at the time of the trial, Kenneth B. Walton, might have relevant evidence to offer. On May 21, Mr. Walton's evidence was taken. At the conclusion of this hearing the parties informed Judge Woodlock that they sought no other testimony and that they did not wish to interrogate Judge Freedman.

Judge Woodlock made the following ultimate finding:

> Based upon my review of the materials of record in this case and the evidence adduced at the evidentiary hearings pursuant to my assignment, I find as a matter of fact that after the jury retired to begin its deliberations in this case on November 17, 1994, and before it returned with its verdict, Judge Freedman had no secret communication with the jury outside the presence of counsel. The only communication Judge Freedman had with the deliberating

jury involved the receipt of a jury question concerning interest, which he shared with counsel, and responded to in writing, pursuant to his standard practice regarding such inquiries.

We have reviewed carefully the record of the evidentiary hearings held by Judge Woodlock and the detailed subsidiary findings he made. We unhesitatingly affirm his ultimate finding and his underlying subsidiary findings.[4]

### III.

### CONCLUSION

The judgments of the district court in both trials are *affirmed*.

*No costs to either party.*

---

**4.** In view of Judge Woodlock's findings, we need not address the question of whether the initial contacts between Lombard and Lavallee, and the subsequent securing of the affidavit, violated the mandate of *Kepreos*, 759 F.2d at 967. Accordingly, we express no opinion on that question.