**Eve RAYBOURN, Plaintiff**

v.

**SAN JUAN MARRIOTT RESORT AND STELLARIS CASINO, Defendant**

No. 02–1734 JP.

United States District Court,
D. Puerto Rico.

April 16, 2003.

Jorge M. Suro Ballester, Esq., San Juan, for Plaintiff.

Alejandro López Lorenzo, Esq., Javier I. Pérez Suárez; Esq., Pinto–Lugo, Oliveras & Ortiz, PS, San Juan, for Defendants.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION AND PROCE-DURAL BACKGROUND

The Court has before it San Juan Marriott Resort and Stellaris Casino's (hereinafter "Marriott") "Motion for a New Trial and/or Alternative Request for Remittitur" (**docket No. 25**), and Plaintiff's opposition thereto (**docket No. 26**). For the following reasons, Marriott's motion is hereby GRANTED IN PART AND DENIED IN PART.

This is a civil action based on negligence brought forth by Plaintiff Eve Raybourn as a consequence of an accident that occurred at the San Juan Marriott Hotel on June 6, 2001, when she slipped and fell in the bathtub of room 2005 due to a defect in said bathtub. The Marriott admitted liability; they admitted that the bathtub was defective, and admitted that the accident suffered by Plaintiff occurred because of Marriott's negligence. Therefore, the jury was instructed at the beginning of the trial that their function at the trial was not to determine any liability, but rather only to determine the fair measure of damages, if any, that they could choose to award Plaintiff as a result of the accident. Therefore, the only questions which were presented to the jury were: whether they found that Plaintiff had proven damages by a preponderance of the evidence, and if they answered yes to that question, they were instructed to indicate the amount of damages they chose to award Plaintiff in three categories: 1) for pain and suffering as a consequence of the injury Plaintiff suffered, and the fact of its permanency, if any; 2) for loss of earnings, if any; and 3) for medical expenses, if any.

After a three day trial, the jury returned its verdict holding that Plaintiff had proven her damages by a preponderance of the evidence, and awarded her $500,000.00 in pain and suffering, $150,000.00 in loss of earnings, and $10,000.00 in medical expenses.

## II. DEFENDANT MARRIOTT'S ALLEGATIONS

Marriott alleges that the jury verdict cannot stand for various reasons. First,

Marriott moves for a new trial asserting that the fact finder's verdict is against the clear weight of the evidence, and that a new trial is necessary to prevent a miscarriage of justice. It additionally alleges that the amount of the jury verdict is so excessive and unreasonable that it shocks the conscience. In the alternative, Marriott moves for remittitur of the amount of the judgment to reflect "the maximum amount that the jury would have awarded without being excessive".

## III. PLAINTIFF'S ALLEGATIONS

Plaintiff contends that Marriott has failed to raise any valid basis for a new trial or for an amendment of the judgment, since the amounts awarded in the jury verdict in all three categories are based upon the great weight of the evidence. Citing to the trial transcript, Plaintiff bolsters his argument with the testimony of the Plaintiff, her witness and her expert.

## IV. MOTION FOR A NEW TRIAL UNDER RULE 59

Rule 59 of the Federal Rules of Civil Procedure broadly permits a trial court to order a new trial based upon the motion of a party or upon the Court's own initiative, "for any of the reasons for which new trials have heretofore been granted". Fed.R.Civ.P. 59(a). Some of those reasons include claims that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury," *Cigna Fire Underwriters v. MacDonald & Johnson*, 86 F.3d 1260, 1262–63 (1st Cir.1996) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940)).

The decision whether to grant a motion for a new trial lies within the sound discretion of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). However, it has been well established that trial courts must exercise their discretion in favor of granting a new trial very sparingly, since "a jury's verdict on the facts should only be overturned in the most compelling circumstances." *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 811 (1st Cir.1988); *see also Keeler v. Hewitt*, 697 F.2d 8, 11 (1st Cir.1982). Therefore, the Court must exercise appropriate caution when deciding whether it is necessary to set aside a jury verdict. *See Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir.1988).

Since the jurors are the ultimate triers of fact, the trial Court is especially reluctant to order a new trial when the verdict rendered rested upon the jury's determination of the credibility of witnesses. *Ríos v. Empresas Líneas Marítimas Argentinas*, 575 F.2d 986, 990 (1st Cir.1978). However, it is clear that even if the trial court could have reached a verdict opposite from the jury, the court shall not upset a jury verdict which is reasonably based on the evidence presented at trial. *Velázquez v. Figueroa–Gómez*, 996 F.2d 425, 428 (1st Cir.1993). Therefore, a trial court shall order a new trial "only if the verdict, though rationally based on the evidence, 'was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice,'" *Fernández v. Corporación Insular De Seguros*, 79 F.3d 207, 211 (1st Cir.1996) (*citing Lama v. Borrás*, 16 F.3d 473, 477 (1st Cir.1994)); *see also Federico v. Order of St. Benedict in Rhode Island*, 64 F.3d 1, 5 (1st Cir.1995).

Plaintiff was injured in June 2001 at the Marriott hotel. After undergoing treatment in Puerto Rico by Dr. Pagán, Plain-

tiff returned to the United States a few days later, where she began seeing Dr. Gerald Price and underwent numerous therapy sessions from the time of her accident in June 2001 until September 12, 2001. In March 2002, Plaintiff visited the office of Dr. Templeton, because she was suffering from bronchitis. However, when answering a questionnaire at Dr. Templeton's office regarding her health, Plaintiff did not indicate that she had any cervical, neck or back problems or any pain. In May 2002, Plaintiff suffered another fall while hiking.

Marriott's argument that the damages awarded are excessive is divided into three main points: that the evidence presented regarding Plaintiff's physical injuries does not support the compensatory award; that there was no evidentiary basis for the loss of earnings award; and that the evidence presented for medical expenses only supported an award for $9,870.00. Defendant's main argument centers on the fact that Plaintiff suffered a second accident or fall while hiking in May 2002, a year after the incident at the Marriott. It alleges that Plaintiff had not complained of her injuries again after her therapy sessions ended in the United States in September 2001; that she was well enough to go hiking one year after the accident and fell again, and that it was this intervening cause which caused or aggravated whatever symptoms Plaintiff was suffering from after her fall in June 2001 at the Marriott. Marriott further contends that upon filing out a questionnaire at Dr. Templeton's office before her hiking accident in March 2002, Plaintiff indicated she had no symptoms or discomfort of the kind she alleges to have been caused by the accident at the Marriott, and contends that this inconsistency renders the jury verdict contrary to the weight of the evidence.

■ The Court finds all of Marriott's arguments unpersuasive. It is undisputed that Plaintiff underwent many therapy sessions with Dr. Price after her fall at the Marriott, at least until September 2001. She testified that Dr. Pagán administered at least three shots for her pain, and recommended she remain in Puerto Rico for further therapy. After her return to the United States, she was seen by Dr. Price, who found that Plaintiff was suffering from a left C5–6 radioculopathy (referring to a problem with cervical 5 and cervical 6 nerve roots) and perhaps mild left carpal tunnel syndrome, and administered therapy for some three months after the accident.

At the time Dr. Carlo, Plaintiff's expert, examined Plaintiff in September 2002, he found that she was still suffering from pain in her shoulders, neck, left arm, nerve root irritation, and muscle spasms. In addition, he testified that he conducted a series of clinical tests on Plaintiff to determine the extent of her injuries and pain. He opined that she was suffering, at that time, from status post-cervical whiplash injury, chronic cervical strain, (meaning an injury of the muscles and tendons and other tissues that are not bone, which persists even with treatment and usually over six months), chronic cervical and trapezium miositis (which is an inflammation of both those muscles), and left cervical radioculopathy (meaning a nerve root problem at the neck level). He further testified that he opined that Plaintiff had a permanent total body disability of 12%. Dr. Carlo also stated that Plaintiff's condition had turned chronic, meaning that the therapy she was undergoing was no longer having a beneficial effect.

Plaintiff herself testified that at the time of the accident, she was given some shots for her pain, including a prescription for a muscle relaxant, thereby evidencing the

amount of pain she was in at the time of the accident. She further testified as to her inability to work in repairing computers, since she could no longer take the monitors to her shop to be repaired. Her friend Cheryl Johnson testified on the stand that at the time of the accident while still in Puerto Rico, Plaintiff needed help to perform daily chores, and therefore a co-worker of Ms. Johnson stayed with Plaintiff during the day. Ms. Johnson further stated that upon Plaintiff's return to the United States, she stayed with her sister for some time because she needed daily help, and also stayed with her (Ms. Johnson) for the same reason. Ms. Johnson further alluded to the change that Plaintiff's personality had undergone as a result of the accident, where she now is an easily depressed and easily irritable person.

The Court also heard testimony from Dr. Alvarez Berdecía, Defendant's expert, who elaborated and illustrated the Court regarding the medication Plaintiff was given at the time of the accident: Plaintiff was given a shot of Toradol (DESCRIPTION: ketorolac) which is used to relieve moderately severe pain, usually pain that occurs after an operation or other painful procedure. It belongs to the group of medicines called non-steroidal anti-inflammatory drugs (NSAIDs). It is not a narcotic and is not habitforming.[1]

She was also injected with Norflex, (DESCRIPTION: Orphenadrine). It is used to help relax certain muscles in the body and relieve the stiffness, pain, and discomfort caused by strains, sprains, or other injury to your muscles.[2]

Lastly, she was given a prescription for Vioxx tablets (DESCRIPTION: Rofecoxib), which are used to relieve some symptoms caused by arthritis, such as inflammation, stiffness, and joint pain.[3]

However, Dr. Alvarez Berdecía stated that he did not know whether or not Plaintiff was in fact given these medications. He declared that these medications appeared on Plaintiff's medical records, but he had no way of knowing whether or not they had actually been administered. Dr. Alvarez further testified that Plaintiff had informed him that she was in complete pain when she answered his questionnaire before he examined her on September 9, 2002. He performed a complete neurological examination on her, and concluded that she was only suffering from mild miositis of the left trapezoid muscle, or a mild inflammation or spasm. On the stand, he changed his initial diagnosis of the permanency of Plaintiff's injuries from 5% to 0%, because he opined that it was the subsequent hike, and not the fall at the Marriott, that exacerbated Plaintiff's injuries from the Marriott fall. In fact, he stated that no person with a radicular symptom would be able to hike, thereby concluding that Plaintiff must have been cured from the Marriott accident in order to hike one year later.

Regarding the incident with Dr. Templeton's questionnaire, Plaintiff indicated that she had attended his clinic for bronchitis, and that she had answered the questions in the questionnaire with that illness in mind, not her back and neck injuries. Defendants state that this inconsistency should be noted and greatly weighed.

With its verdict, however, the jury decided that Plaintiff was indeed hurt by the accident at the Marriott, and that the discrepancy between her current condition and whatever she stated in Dr. Temple-

---

1. See www.yahoo.com/health.

2. Id.

3. Id.

ton's questionnaire was an oversight, deserved less weight, or was irrelevant. The Court finds that in the case at bar, there was evidence to support both sides' version of the facts. It is well settled that "when there are two permissible views of the evidence the fact-finder's choice between them cannot be clearly erroneous." *Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1138 (1st Cir.1995) (*citing Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). A summary of Plaintiff's evidence that the fall at the Marriott caused her severe injuries included: multiple injections of pain killers; prescriptions for muscle relaxants and pain killers; a brace; that Dr. Pagán wanted her to remain in Puerto Rico for further therapy; that she needed a wheelchair on her return flight to the United States to change planes; that after her arrival in the United States, she needed assistance to bathe and take care of herself; that she underwent three months of intense therapy in much pain; and that the therapy did not help her, among others.

Defendants had an opportunity to cross-examine Plaintiff, and her witness and expert, and also presented their own witnesses to contradict Plaintiff's version of the facts. However, the jury apparently chose to give Dr. Alvarez Berdecía's testimony lesser weight, and did not believe the hiking fall exacerbated Plaintiff's first injury. In fact, it is equally credible that the hiking fall demonstrated that Plaintiff was attempting to lead a normal life after the Marriott fall but said accident rendered her physically unable to do so.

It is the jury who shall judge how much weight should be given to any particular witness and the credibility of each witness. They are the ultimate triers of fact, thus, the trial court shall be especially reluctant to order a new trial when the verdict rests upon the jury's determination of the credibility of witnesses. *Ríos v. Empresas Líneas Marítimas Argentinas*, 575 F.2d 986, 990 (1st Cir.1988). The jury chose to credit Plaintiff, her witness and her expert witness' testimony over Defendant's witnesses and they could have chosen to as is within the province of the jury. However, "[t]he mere fact that a contrary verdict may have been equally—or even more easily—supportable furnishes no cognizable ground for granting a new trial." *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1333–34 (1st Cir.1988).

In the case at bar, a jury sat through three days of testimony and cross-examination about the intricate details of back injuries, treatment and therapy. After the parties had finished presenting all their evidence, the jury dedicated one day to its deliberations before it reached a verdict. If the evidence proved both sides' version of the facts, the Court cannot hold that the conclusion reached by the jury was lacking in evidentiary foundation. The Court finds that this verdict, finding that Marriott is liable to Plaintiff, is based on the ample evidence presented, and therefore, must be upheld. Defendant's petition for a new trial is therefore **DENIED.**

## V. REMITTITUR

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, a party may request that the court alter or amend the judgment and to set aside a jury verdict. The standard for remittitur requires that "a damage award must endure unless it is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1196 (1st Cir.1995) (*citing Segal v. Gilbert Color Sys., Inc.*, 746 F.2d 78, 81 (1st Cir.1984) (*quoting Grunenthal v. Long Island R.R. Co.*, 393

U.S. 156, 159 & n. 4, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968); internal quotation marks omitted)).

■ Defendants allege that in the alternative the Court should lower the verdict amounts. The Court agrees. The Court finds that the jury's award of $500,000.00 is grossly excessive and inordinate in light of the evidence presented. *Correa,* 69 F.3d at 1196. In particular, it finds that the jury was specifically guided by the Complaint, which asks for that same amount in damages. In reaching this decision, the Court closely took into consideration that Plaintiff can walk, talk and sit normally even if for short periods of time, as evidenced by her data entry job in Washington, D.C.; and that Plaintiff can work at least any job requiring telephone interaction, as evidenced by her work with technical support software calls. Plaintiff has not lost any of her limbs, has not been reduced to the use of a wheelchair or other walking apparatus, nor was her brain affected in any way as a result of this accident. *See Grajales–Romero v. American Airlines, Inc.,* 194 F.3d 288 (1st Cir.1999) (award of $150,000.00 to airline passenger who was diagnosed with post-concussion syndrome and cervical strain after sign at ticket counter collapsed on him, and who continued to suffer from both chronic neck pain and a loss of cognitive functions, including concentration and memory, was not excessive); *Fowler v. Boise Cascade Corp.,* 948 F.2d 49 (1st Cir.1991) (award of $675,000.00 to injured worker who suffered chronic pain syndrome which totally disabled him was not excessive; prior to injury, worker was a productive worker but, since the injury, had been unable to perform even the simplest of tasks).

Therefore, the Court hereby remits Plaintiff's award for damages for pain and suffering to Three Hundred Thousand Dollars (**$300,000.00**).

■ Regarding the award for loss of earnings, the Court finds the same to be unsupported by the evidence that was presented at trial. It has been well established that in order for an award of damages to ensue, they must be proven with *reasonable certainty. See Allens Mfg. Co., Inc. v. Napco, Inc.,* 3 F.3d 502 (1st Cir. 1993); *National Chain Co. v. Campbell,* 487 A.2d 132, 134–35 (R.I.1985) (damages must be established "with reasonable degree of certainty" and plaintiff "cannot rely upon speculation" in order to prove his damages); *Restatement (Second) of Contracts* § 352 (1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

In the case at bar, the Court finds that Plaintiff's evidence does not identify those damages with the reasonable certainty that the law requires. Plaintiff merely stated on direct examination the amount of money she used to make ($65.00 per hour), without any further information or documentation evidencing said income, for instance, tax returns showing how much money she previously made; bank accounts showing deposits for this year, how many hours she worked a week or a day, and the like. Plaintiff merely informed the Court and the jury how much she made before the accident, and then let them do the math for her. She also mentioned a data entry job in Washington, D.C. where she worked for two months and earned $12.50 an hour. However, this testimony was also unsupported by documents or other information of how many hours she worked in a week or a day.

Once again, the Court must mention that the burden of proving loss of earnings is on the Plaintiff; that is to say, she must not only allege loss of earnings, but must also *prove that she would have earned that money.* Without an estimation of time;

that is to say, without knowing how many hours a week Plaintiff worked on average (particularly in view that Plaintiff was self-employed), without knowing how many days a week or a month she worked on average, or without a previous tax return showing how much she made on a previous year, the jury had no basis to compute her loss of earnings. Therefore, the amount they awarded Plaintiff was decided upon by sheer speculation.

Plaintiff counters by computing the number of weeks elapsed since the accident until the opposition was filed, 82, working 40 hours per week, at $65.00 an hour. However, Plaintiff calculates this number squarely across the board, without so much as a sick day, a holiday, or even a coffee break included in the calculation therein. The Court cannot accept such fuzzy math. In addition, Plaintiff herself testified that she now works by doing software consulting over the phone, and that she worked in a temporary position in Washington D.C., thus evidencing that she has actually mitigated her lost wages. After evaluating the evidence the Court **FINDS** that Plaintiff has not demonstrated with reasonable certainty the amount she sustained in loss of earnings. Therefore, in absence of facts from which a reasonably clear formula for computing these damages can be created, the Court hereby **VACATES** the amount awarded by the jury for loss of earnings.

The Court must mention that loss of earnings is a clear mathematical formula. The Court was forced to vacate the jury's award for loss of earnings because the parties did not prove with reasonable certainty the facts necessary for the proper mathematical calculation. Although Defendants admitted liability from the beginning, they did not even take Plaintiff's deposition. In addition, the Court finds that Defendants did not even inquire as to

any documentation evidencing Plaintiff's loss of earnings, nor did Plaintiff file any relevant information to help the jury reach an informed decision regarding her loss of earnings. Absent any kind of documentation or other evidence establishing these damages, the Court was forced to vacate the jury's award. There was simply no mathematical equation that could reasonably provide for the many uncertain and unknown factors in this calculation.

Finally, the Court must mention that Marriott petitioned the Court for remittitur of the amount of the judgment to reflect "the maximum amount that the jury would have awarded without being excessive". Defendant requests this Court play Nostradamus and actually divine an amount somewhere between zero and $660,000.00 that the jury would have awarded that would not have been excessive, and chose not to lend any illumination as to what they believed this amount should be. However, the Court thinks that the jury did, in fact, give a reasonable award in their minds, and Defendant merely wishes that *the Court* ascertain a reasonable figure of damages. Regarding the loss of earnings, the Court reiterates that it is a specific mathematical equation, and the jury was left without any meaningful documentation, facts or argument that would enable it to calculate this sum. The role of the Court must be to come to an informed decision based upon information and arguments provided by the parties. It is evident to the Court that the parties' aid was not forthcoming and was, in fact, lacking in this instance.

Regarding the award of $10,000.00 for medical expenses, Plaintiff agrees to have it reduced to the exact amount evidenced by Plaintiff's medical bills at trial, **$9,870.00**. Therefore, the Court also remits this sum accordingly.

## VI. CONCLUSION

For the aforementioned reasons, the Court hereby **DENIES** Defendant's petition for a new trial, and **GRANTS IN PART** Defendant's petition to remit the jury's verdict and hereby remits the same as follows: to **THREE HUNDRED THOUSAND DOLLARS ($300,000.00)** for pain and suffering; **VACATES** the jury's award for loss of earnings; and to **NINE THOUSAND, EIGHT HUNDRED AND SEVENTY DOLLARS ($9,870.00)** for medical expenses, for a total sum of **THREE HUNDRED AND NINE THOUSAND, EIGHT HUNDRED AND SEVENTY DOLLARS ($309,870.00).**

**IT IS SO ORDERED, ADJUDGED AND DECREED.**