Jules G. FRISARD, Jr.

v.

TEXACO INC.

Civ. A. No. 78–2121.

United States District Court,
E. D. Louisiana.

Nov. 17, 1978.

---

Geoffrey H. Longenecker, New Orleans, for plaintiff.

Charles W. Lane, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant.

JACK M. GORDON, District Judge.

## MEMORANDUM AND ORDER

This matter is before the Court on motion of the plaintiff, Jules G. Frisard, Jr., for a preliminary injunction against the defendant, Texaco Inc. Plaintiff is seeking injunctive relief pursuant to the Petroleum Marketing Practices Act of 1978, 92 Stat. 322. A hearing on the preliminary injunction request was held July 21, 1978, after which counsel were given additional time to brief the issues before the Court took the matter under submission. Having thoroughly reviewed the evidence presented at the hearing, the statute in question, and the memoranda of counsel, the Court has decided to DENY the preliminary injunction for the following reasons.

### FACTS

Plaintiff operated a Texaco gas station located at 12930 Chef Menteur Highway, New Orleans, Louisiana, 70129, since he began his contractual relationship with Texaco in 1972. In 1973, plaintiff and defendant entered into a lease agreement dated May 1, 1973, and expiring June 30, 1974, which provided for year-to-year renewal subject to termination by either party upon ten days' written notice. (See, Texaco Exhibit 2.) The lease further provided in clause (5):

> Lessee shall . . . maintain the said premises, buildings and equipment in good repair and in a clean, safe and healthful condition. In the event of lessee's failure to do so, the lessor *may* make the necessary repairs for the account of lessee. . . . (Emphasis supplied)

In August of 1977 there began a series of plumbing repairs at plaintiff's gas station, all necessitated either by stopped up toilets or a blocked-up sump in the station's car wash. (See, Texaco Exhibit 3.) At least once a month, or sometimes twice a month, it was necessary to send a plumber to the station to unstop the toilets. Each time, a plumber's snake was run through the entire line and no broken sewer pipe was ever found. The trouble with the toilets was either "mess" in the toilets, or towels and paper stuffed in the toilets. Occasionally, mud from the sewer line backed up into the toilets. Although plaintiff argued that a leaky roof caused water to collect in his salesroom, the plumbing receipts show that the leaking in the walls was caused by the problem with the ladies' toilet. Furthermore, the clogging up of the car wash sump caused the bays to back up, which in turn resulted in the mud backing up into the toilets.

At this point in time, late 1977, plaintiff's gas station was primarily being run by its 20-year-old manager, Joey Klein. Mr. Frisard would come by in the morning to check on operations, and then would leave the gas station for the day, leaving Joey a phone number where he could be reached. When the receipts from the plumbing bills were signed by someone at the gas station, it was Joey who signed them. When a Texaco representative stopped by at the station, Joey was usually the only "man in charge" for the representative to talk to.

Texaco began to be annoyed with the repeated incidents of plumbing problems at Mr. Frisard's gas station. Mr. Ellis Wills, Jr., the Texaco representative for the New Orleans East area where the station is located, met with Mr. Frisard personally in January, 1977, to tell him that it was Frisard's responsibility to keep both the car wash and the restrooms in clean condition, although Texaco would be responsible for major repairs such as broken sewer lines. In October, 1977, Wills again met with Mr. Frisard and noted the recurring condition of the stopped toilets, and Frisard promised to keep them clean in the future. On January 3, 1978, Mr. R. J. Haun, a Texaco Customer Service representative, visited the station and filled out a Customer Evaluation (Texaco Exhibit 7), stating that the station "failed—due to restrooms." Mr. Haun testified that he discussed the problem with Joey Klein because Mr. Frisard was not there that day. Mr. Wills reviewed the Customer Evaluation rating with Mr. Frisard later in January, 1978, and noted that the problem appeared to be corrected. However, in February more trouble was

reported, and Wills again visited the Frisard station on March 4, 1978, when he discussed the restroom problem with Joey Klein because Jules Frisard was not there. Wills told Joey it was the station owner's responsibility to keep the toilets from overflowing and that Texaco would not pay the plumbing bills unless there was a broken pipe or line.

As a result of this discussion regarding the eternal toilet problem, Joey Klein put two handwritten signs on the restrooms on approximately March 7, 1978, telling the public the toilets did not work, and that Texaco was too "tight with their money" to fix them. The signs gave the name of Ellis Wills, and his phone number, to call with complaints. (See, Texaco Exhibit 5.) Customers did call and complain, resulting in a Customer Complaint letter on Jules Frisard, noting that "the retailer refuses to have the necessary repairs done" and that "the retailer has been informed by our Maintenance Center in Houston, Texas, and by Texaco that he is responsible for the upkeep of the restrooms and he still refuses to have them unstopped." (See, Texaco Exhibit 6.) Ellis Wills went to the station on March 9, 1978, to remove the signs, and he testified that the condition of the toilets at that time was so bad you could not even enter the rooms. Wills therefore got a plumber out to the station immediately.

At this point Texaco made an internal decision that the lease with Jules Frisard should not be renewed after it expired on June 30, 1978. Accordingly, under the then existing law, Texaco sent to Frisard a letter dated March 28, 1978, which stated that Texaco had decided not to renew its existing contracts with Frisard after midnight June 30, 1978, but which did not state the reason *why* Texaco was not going to renew. (Texaco Exhibit 10) The March 28 letter is marked "Certified Mail—Return Receipt Requested."

The existing law regarding contractual relationships between oil companies and gas station operators was then drastically altered when the Petroleum Marketing Practices Act of 1978 was signed into law and

made effective on June 19, 1978. Since Texaco's contractual arrangements with Jules Frisard did not expire until June 30, 1978, and since it was initially unclear whether the new act (hereinafter referred to as the "PMPA") would be applied to those arrangements, Texaco sent Frisard a second letter, dated June 27, 1978, and also marked "Certified Mail—Return Receipt Requested." (Texaco Exhibit 11) The June 27th letter made reference to the March 28th letter, and reiterated the intention not to renew the relationship. It further made reference to the PMPA, and cited as Texaco's reason for failure to renew under the Act, Section 102(b)(3)(C) of the act which provides for non-renewal of a franchise relationship when the franchisee (Frisard) fails "to operate the marketing premises in a clean, safe and healthful manner." The letter also reminded plaintiff that he had been notified on at least two prior occasions of the unclean condition of the gas station, and that "A copy of the summary of the provisions of Title 1 of the [Act] prepared by the Secretary of Energy as contemplated in Section 104(c)(3)(C) will be forwarded to you as provided for in the Act after publication in the Federal Register." Plaintiff, upon receipt of this second notice of non-renewal, promptly filed this lawsuit under the PMPA, seeking injunction relief and damages.

## DISCUSSION

The Petroleum Marketing Practices Act of 1978 was designed to equalize the relative bargaining strengths of oil company franchisors and individual franchisees, such as Mr. Frisard. The Act is a complex piece of legislation which creates a new concept called a "franchise relationship," that is, an entity separate from, but defined by, the "franchise," or contractual arrangement existing between the parties. The Act then prohibits a franchisor from either terminating a franchise or failing to renew a franchise relationship, except under certain carefully defined conditions, and then, only for the specific grounds permitted by the Act. The enforcement provisions of the

PMPA permit suit in federal court whenever a franchisor violates the Act, and provides authority for both injunctive relief and damages. It further provides its own standards for both burden of proof, and the issuance of a preliminary injunction.

In the instant case, plaintiff Frisard contends that when the PMPA was signed into law on June 19, 1978, it immediately governed the remaining days of his lease with Texaco, and hence created for him a legally protected franchise relationship. Plaintiff argues that Texaco violated the PMPA by failing to give a timely notice of nonrenewal under the Act, by failing to inform him of a permissible ground for nonrenewal, and by not renewing his franchise relationship in the absence of a valid ground for nonrenewal. Accordingly, Frisard contends that he is therefore entitled to relief under the PMPA.

Texaco's position, on the other hand, is that (1) the PMPA does not apply to their arrangement with Frisard, (2) that they fully complied with the PMPA if it does apply, but that (3) the PMPA is unconstitutional because it retroactively takes away their right to nonrenewal without cause, without just compensation, thus violating the Fifth Amendment of the United States Constitution.

The Court must therefore decide the following issues: (1) Does the Act apply to the present facts? (2) If it does, has Texaco violated the Act? and (3) Is the Act unconstitutional in its application to Texaco? For the following reasons, the Court finds that the PMPA does apply to the facts herein, Texaco has not violated the Act, and it is not unconstitutional as here construed.

Section 105(a) of the PMPA provides that:

> If a franchisor fails to comply with the requirements of Section 102 or 103, the franchisee may maintain a civil action against such franchisor.

As defined by the Act, Jules Frisard is the franchisee and Texaco is the franchisor. Their lease agreement is the franchise. Section 101(2) defines the term "franchise relationship" to mean:

> . . . the respective motor fuel marketing or distribution *obligations and responsibilities* of a franchisor and a franchisee *which result from* the marketing of motor fuel under a *franchise.* (emphasis supplied)

Section 102(a) provides that:

> Except as provided in subsection (b) and section 103, *no franchisor . . . may* —
>
> (2) fail to renew any franchise relationship. . . . (emphasis supplied)

The concept of a franchise relationship is an important one, as stated above, because it is defined and treated under the PMPA, as an entity separate from the franchise, or contract. Thus, while Texaco may choose not to renew a particular lease with Mr. Frisard, the Act appears to obligate them to renew the "relationship," ostensibly in the form of a new lease, with perhaps, different terms.[1]

Texaco initially maintains that the PMPA does not apply to them because nonrenewal occurred in March, 1978, when the original letter of nonrenewal was sent to Frisard. However, it is obvious to the Court that the March 28th letter was merely a *notice of intent* not to renew, and that the nonrenewal would not actually occur until June 30, 1978, when the Frisard lease would expire. Furthermore, § 101(14) states:

> The terms "fail to renew" and "nonrenewal" mean, with respect to any franchise relationship, *a failure to reinstate,*

---

1. See, for example, p. 20 of the Explanation of the Major Provisions of the Bill (92 Stat. 1666), where it is stated:

> In connection with the non-renewal provisions of the title, the term "franchise relationship" is utilized. The term is defined to cover the broad relationship which exists between a franchisor and a franchisee by rea-son of the franchise agreement. The term is utilized for two reasons. First, in the renewal context, the contract which constitutes the franchise may no longer exist and the term "franchise relationship" is utilized to avoid any contention that because the "franchise" does not exist there is nothing to renew. . . .

*continue, or extend the franchise relationship—*

    (A) at the conclusion of the term, or on the *expiration date,* stated in the relevant franchise . . . (emphasis supplied)

In addition, § 102(a)(2) provides in full that no franchisor may fail to renew a franchise relationship "without regard to the date on which the relevant franchise was entered into or renewed." Thus the Act, by its own terms, encompasses the nonrenewal situation which presently confronts the Court. Since this failure to renew, both by common sense and statutory definition, occurred after the effective date of the PMPA, and since the Act further contemplates application of the nonrenewal provisions to existing franchises entered into *before* the effective date, the Court finds that the requirements of the PMPA apply to Texaco's actions herein.[2]

Texaco next argues that should the Act be found to apply, it fully complied with the Act's provisions. The Court agrees.

The prohibition against failure to renew is not absolute, as exceptions are provided for in subsection (b) of § 102, and in § 103 of the Act. Section 102(b)(1) provides:

    Any franchisor . . . may fail to renew any franchise relationship, if—

        (A) the notification requirements of section 104 are met; and

        (B) . . such nonrenewal is based upon a ground described in paragraph (2) or (3).

As stated earlier, Texaco sent plaintiff a letter dated June 27, 1978, citing as its PMPA ground for nonrenewal § 102(b)(3)(C), failure to operate the premises in a clean and healthful manner.

█ In order to determine whether Texaco complied with the Act, we must carefully examine § 104 and § 102(b)(3)(C), along with the legislative comments. .

**2.** In contrast, § 102(a)(1) provides, with respect to *termination* of a *franchise* that no franchisor may

    (1) terminate any franchise (entered into or renewed on or after the [date of enactment of this Act]) prior to the conclusion of the term, or the expiration date, stated in the franchise;

Section 104(a) initially provides for a 90-day notice of nonrenewal, which notice must contain certain information set forth in § 104(c). Obviously, the March 28 letter, although giving 90 days' notice, could not, except through luck, comply with § 104(a) in terms of its contents, since the PMPA had not yet been enacted. The June 27th letter was an attempt to set forth the required contents, but plaintiff argues it does not comply with § 104(a) because it was not sent 90 days before nonrenewal on June 30th. Nevertheless, § 104(b)(1)(A) provides that the nonrenewal notice may be given in *less* than 90 days "in circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days" before the nonrenewal takes effect. Certainly, the facts before this Court present an instance where it would be unreasonable to require a 90-day notice, for the PMPA only became effective approximately ten days prior to the expiration date of the lease. Accordingly, the Court finds that the June 27th letter from Texaco to Jules Frisard was a timely notice of nonrenewal under the Act.

█ Having found the notice to be timely, we must now look to the requirements of § 104(c) to further determine compliance. Section 104(c) reads:

    Notification under this section—

    (1) shall be in writing;

    (2) shall be posted by certified mail or personally delivered to the franchisee; and

    (3) shall contain—

        (A) a statement of intention . . not to renew the franchise relationship, together with reasons therefor;

        (B) the date on which such . . . nonrenewal takes effect; and

        (C) the summary statement prepared under subsection (d).

Section 101(17) defines "termination" as cancellation. Thus, if Texaco had *cancelled* the lease with Frisard in March, 1978, they would have escaped application of the PMPA.

In the instant case, the June 27th notice of nonrenewal was in writing, posted by certified mail, stated both the intention not to renew as well as the effective date of nonrenewal, cited the unclean condition of the station as the reason for nonrenewal, and referred to the future receipt of the summary statement. Therefore, the June 27th letter was not only timely, but complied with the PMPA in all respects.[3]

Since the Court has found that there is no violation of the PMPA on the face of the documents, it must now look to the merits of the nonrenewal ground asserted by Texaco in order to determine whether plaintiff is entitled to a preliminary injunction, or whether the PMPA should be declared unconstitutional in its application to the defendant, Texaco.

The PMPA sets forth its own standards for determining whether a preliminary injunction should issue in § 105(b)(2), which reads:

. . . the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) . . . the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

Section 105 further provides under subsection (c) that:

. . . the franchisee shall have the burden of proving . . . the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such . . . nonrenewal was permitted under section 102(b) or 103 . . . .

The Court feels that plaintiff has adequately met his burden of proving nonrenewal of the relationship, and that, on balance, the hardships would be greater for the plaintiff than for Texaco should the preliminary injunction be denied; therefore, the only question that remains is whether there exists sufficiently serious questions as to the merits of the case to "make a fair ground for litigation." The Court finds that there are not.

Texaco relies on § 102(b)(3)(C) as its ground for nonrenewal of its relationship with Jules Frisard.[4] That section provides for nonrenewal in the event of:

**3.** With respect to § 104(c)(3)(C)'s requirement that the nonrenewal notice contain the summary statement prepared under § 104(d), a reading of that section shows a continued intent of the PMPA to be reasonable in its construction and application (i. e., not to require that the impossible be performed), already evident by § 104(b)(1)'s allowance of less than 90 days' notice in certain circumstances. Section 104(d) provides for a summary statement of the Act's provisions to be published in the Federal Register not later than 30 days after the effective date of the Act. Since a franchisor who was required under the Act to give a notice prior to publication of the summary in the Federal Register could not include it in the notice, § 104(d)(2) provides that the franchisor may send the summary to the franchisee not later than five days after it is published.

Although plaintiff has not argued here that the June 27th letter was defective for failure to include the required summary, the Court must note that the letter did mention on p. 2 that the summary would be provided to Frisard after publication. It is therefore in compliance with § 104(c)(3)(C).

**4.** One of Texaco's arguments in favor of finding the PMPA to be unconstitutional is that the Act retroactively imposes on Texaco the need for a ground for nonrenewal, whereas prior to its enactment, Texaco could fail to renew without cause. The Court rejects this argument, however, for the purposes of this lawsuit, because the evidence and memoranda of counsel show that Texaco's reason for deciding not to renew in March, 1978, was in fact the unsanitary conditions of the restrooms in plaintiff's gas station, but that in March, 1978, Texaco was under no legal obligation to *tell* plaintiff the "cause" for nonrenewal. Hence, the true reason for nonrenewal of plaintiff's lease was a "ground" provided for in the PMPA, and nothing was retroactively imposed on Texaco in that sense.

A failure by the franchisee to operate the marketing premises in a clean, safe and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

Plaintiff contends that he is entitled to the injunction because (1) his gas station *was* run in a clean, safe and healthy manner, and (2) that § 102(b)(3)(C) requires at least two *written* notices to the franchisee of the alleged unclean conditions before this ground for nonrenewal may be relied on. Plaintiff asserts that not only did Texaco fail to give him two written notices of the existence of unclean conditions, but that Texaco *never* told him, either orally or in writing, that they were dissatisfied with the condition of the station. Texaco, of course, relies on the plumbing problems recited above as being the "unclean condition" that necessitates nonrenewal, and they further argue that the PMPA does not require written notices of said condition.

■ Texaco argues that the unsanitary condition of the toilets at Jules Frisard's gas station was the result of his repeated failures to adequately maintain both the toilets themselves, and the sump of the car wash, which, when it was clogged, caused mud to back up into the toilets. Texaco further argues that § 102(b)(3)(C) does not require that the minimum two prior notices be written, and that the admonitions of Mr. Wills and others to Joey Klein, as well as to Jules Frisard, constituted compliance with this notice requirement. The Court agrees.

In the legislative explanation of the bill's provisions, this section is explained at page 26 (92 Stat. 1672):

> With respect to the repeated failure of the franchisee to operate the marketing premises in a clean, safe, and healthful manner, it is intended that a course of conduct indicating the unsuitability of the franchisee to continue operation of the franchise should be demonstrated by the failures, the repeated notices from the franchisor to the franchisee seeking proper operation, and the continued failure of the franchisee to operate the prem-

> ises in the described manner. The course of conduct sufficient to justify nonrenewal based upon this ground is not intended to be reduced to mathematical certainty. The requirement for repeated failures and repeated notices is a variable one. A minimum of two notices is required in all circumstances and the franchisee must continue to fail to operate the marketing premises in a clean, safe and healthful manner after the receipt of each of these notices.

.    .    .    .    .

Thus, the section does not appear to require that the two notices be in writing, although plaintiff argues that when the legislative history uses the language "after the *receipt* of each of these notices," this language implies that written notices are necessary.

■ Were the Court to accept plaintiff's interpretation of the legislative comments, it could pose a serious threat to the constitutionality of the PMPA, for it would retroactively impose on Texaco a notice requirement with which it would be impossible to comply. To the contrary, this Court is under an obligation to construe the Act in such a way as to *avoid* any serious doubt of its constitutionality. *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). A court must not destroy an Act if it is possible, consistent with the will of Congress, to construe it so as to comport with constitutional limitations. *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

It has already been shown that other sections of the PMPA reflect a general attempt on the part of Congress to supply reasonable restrictions on franchisors caught in the clutches of the Act in its early days (for example, the ability to provide less than 90 days' notice, and to not send a summary statement that does not exist). The legislative comments to this particular section state that the course of conduct sufficient to trigger this nonrenewal ground need not be measured with "mathematical certainty," also a reasonable appli-

cation. Section 102 does not specify that the notices be in writing, even though § 104 is very explicit that the actual notice of nonrenewal must be in writing. Thus the Court can find no reasonable basis in either the Act or the legislative comments for a construction which would require more of Texaco than it did under the circumstances. On the present facts, § 102(b)(3)(C) requires only that a sufficiently unsanitary condition exist at the franchisee's station, and that the franchisor have apprised the franchisee or his manager of the need to correct that condition, either orally or in writing, on at least two occasions prior to a determination not to renew that franchise relationship.

On the facts presented at the hearing, the Court finds that defendant Texaco has met its burden of proof. The condition of the toilets at plaintiff's gas station was that they were perpetually stopped up or overflowing due to plaintiff's failure to clean the paper and mess out of them, and to regularly clean the car wash sump (which caused the bays to back up into the toilets). There was never any broken sewer pipe, or other broken pipe, found to be causing the stoppage. The problem was chronic, and continued from approximately August of 1977 through March of 1978. Either Mr. Frisard or Joey Klein received oral notices from Ellis Wills and others, on at least two separate occasions that it was plaintiff's duty to unstop the toilets, and not Texaco's. Plaintiff still refused to correct the problem. Under the circumstances, the Court finds that there is *no* substantial question going to the merits of Texaco's defense, and that the PMPA, as here construed, is not unconstitutional in its application to Texaco.

Accordingly, IT IS HEREBY ORDERED that the request for preliminary injunction be and is hereby DENIED.