# United States Court of Appeals
## For the First Circuit

No. 01-1791

SEAHORSE MARINE SUPPLIES, INC.,

Plaintiff, Appellee,

v.

PUERTO RICO SUN OIL COMPANY,

Defendant, Appellant.

No. 01-1792

SEAHORSE MARINE SUPPLIES, INC.,

Plaintiff, Appellant,

v.

PUERTO RICO SUN OIL COMPANY,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]
[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Carlos A. Rodriguez-Vidal, with whom Goldman, Antonetti & Cordova was on brief, for Puerto Rico Sun Oil Company.

Luis A. Oliver-Fraticelli, with whom Fiddler, Gonzalez & Rodriguez was on brief, for Seahorse Marine Supplies, Inc.

---

July 9, 2002

---

**COFFIN**, <u>**Senior Circuit Judge**</u>.    These appeals are the latest chapter in a decade-long conflict between appellant/cross-appellee Puerto Rico Sun Oil Company ("Sun Oil") and appellee/cross-appellant Seahorse Marine Supplies, Inc. ("Seahorse").  The dispute arose at the end of a long relationship between the parties, during which Sun Oil had provided fuel, predominantly diesel, to Seahorse. Seahorse sued Sun Oil, invoking the protections of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-41, and contending that Sun Oil improperly terminated the parties' relationship in violation of that statute.  Seahorse prevailed at trial, and Sun Oil now challenges the district court's finding of subject matter jurisdiction, the jury instructions, the admission of certain expert testimony, and the denial of a motion for a new trial.  Seahorse cross-appeals and disputes the sufficiency of the evidence as to its purported failure to mitigate damages.  We affirm in all respects.

## I.  Factual Background

Sun Oil, an oil refinery operating in Yabucoa, Puerto Rico, and Seahorse, a marine supplies distributor and ship repair/maintenance service, began their business relationship in 1983, when Seahorse started selling Sun Oil's unbranded fuel oil.[1] On July 23, 1988, the parties executed a trial franchise agreement expressly governed by the PMPA.  Pursuant to that agreement, Sun

---

[1] "Unbranded" and "branded," terms of art in the petroleum industry, refer to whether fuel is sold under the trademark of the refiner.

Oil authorized Seahorse to use and display Sun Oil's trademark for the purpose of identifying and advertising the source of the product. In April 1989, Sun Oil terminated the trial franchise agreement pursuant to the terms of the PMPA. The parties negotiated during the following several months, and on September 30, 1989, entered a one-year agreement permitting Seahorse to continue to sell the same fuel products under Sun Oil's trademark. The agreement did not specifically mention the PMPA, but it provided that it was "subject to interpretation and enforceability under the laws of the Commonwealth of Puerto Rico and the laws of the United States of America."[2]

As that agreement neared its end date, the parties agreed to extend the agreement while they negotiated its renewal, and they continued in that fashion through September 1991. On September 18,

---

[2] Sun Oil argues that the September 1989 agreement reflected an intentional change from supplying fuel for use by vehicles on land (and thus was covered by the PMPA) to supplying fuel for marine uses (and thus allegedly was not subject to the PMPA).

The record reveals no support for this contention. Although Sun Oil attributes the termination of the trial franchise agreement to Seahorse's lack of interest in serving land use vehicles, the notice of termination under the PMPA gave as the sole reason for termination the explanation that the agreement "was drafted only to cover a trial relationship." There is no evidence of any discussion concerning land versus marine end use. Indeed, Sun Oil wrote merely that a new agreement would be negotiated, involving a new term, agreed upon price changes, and a new termination provision, all subject to the PMPA.

Contrary to Sun Oil's argument that the new agreement covered no motor fuels for automotive use other than diesel fuel -- impliedly suggesting fuels different from those in the earlier agreement -- the fuels and the quantities were identical. In fact, the two contracts are substantially identical in all respects, with the following exception. In place of a clause specifically referencing the PMPA, there was the more comprehensive clause quoted in the text. Neither party has contended that there was any discussion concerning this substitution.

1991, Sun Oil changed its price posting method from a weekly pricing formula to a daily one.[3] In November, Sun Oil began rationing the fuel it would sell to Seahorse. It later stopped all delivery of its product to Seahorse on credit. In January 1992, Seahorse stopped buying fuel from Sun Oil. On February 17, Sun Oil sent Seahorse a letter demanding that Seahorse discontinue use of Sun Oil's trademark. The parties' relationship ended, this litigation ensued, and a short time later Seahorse shut down its operations.

## II. Procedural Background

Seahorse filed suit on March 12, 1992, invoking the protections of the PMPA and alleging wrongful termination or nonrenewal of its franchise by Sun Oil. On May 7, Sun Oil filed a motion to dismiss, challenging subject matter jurisdiction on both diversity and federal question grounds. The district court (Pérez-Giménez, J.) granted the motion to dismiss on diversity grounds, but concluded that subject matter jurisdiction was present under a "liberal construction" of the PMPA. Specifically, the district court concluded that the PMPA's definition of "motor fuel" includes "maritime and industrial motor fuels, used by any type of motor vehicles, including trucks and boats, in public roads or any type of way, including the seas." On November 29, the district court denied Sun Oil's request for reconsideration, or, alternatively,

---

[3] The parties hotly contest the impact of this change. Sun Oil posits that it should have made Seahorse more profitable, but Seahorse asserts that it negatively and irreparably damaged its business.

for certification of an immediate appeal under 28 U.S.C. § 1292(b). The case was subsequently transferred to Judge Domínguez.

On February 16, 1995, Seahorse filed a motion for partial summary judgment based on Sun Oil's alleged failure to provide the PMPA's requisite notice to terminate the relationship. That motion was referred to a magistrate judge, who recommended that it be denied and concluded that

> there exists a plethora of evidence in the form of communications between the parties (which includes letters and faxes), which could lead a reasonable trier of fact to conclude that Seahorse was on actual notice of the particulars required by the Act, and that additional written notice would have been an exercise in futility as it would [have] merely equat[ed] with an elevation of form over substance.

(Internal quotations omitted.) On August 7, 1997, the district court rejected the magistrate judge's recommendation that summary judgment be denied. Instead, it concluded that because Sun Oil's February 17, 1992 letter to Seahorse did not comply with the Act's notice requirements, Sun Oil was strictly liable to Seahorse under the PMPA.

On August 21, 1997, Sun Oil moved to alter, amend or clarify the August 7 order, and, inter alia, again requested that the court certify the order for interlocutory appeal under 28 U.S.C. § 1292(b). On December 30, 1997, the court reversed its prior grant of summary judgment, finding that a reasonable jury could conclude that Seahorse voluntarily had abandoned its relationship with Sun Oil, but left intact the finding that if there was no voluntary abandonment, Sun Oil was liable. The district court also certified the jurisdictional question for appeal to this court.

-6-

Despite this certification, we denied Sun Oil's petition on February 27, 1998.

Trial began on October 4, 1999 and continued through December 21. The court limited the triable issues to (1) whether Sun Oil had terminated or non-renewed, or whether Seahorse had voluntarily abandoned, the franchise; and (2) if Sun Oil had terminated or non-renewed, the amount of damages to which Seahorse was entitled.

On November 2 and 3, 1999, the court held a hearing under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), regarding Sun Oil's challenges to Seahorse's expert testimony. The court concluded that the expert testimony was admissible and its strength should hinge on the jury's credibility findings.

The jury concluded that Sun Oil had illegally terminated or non-renewed the parties' relationship and awarded Seahorse $2.5 million.[4] On December 30, 1999, the district court entered judgment pursuant to the verdict. The court later denied a variety of post-judgment motions and reentered judgment on March 30, 2001. Sun Oil and Seahorse subsequently timely filed their respective notices of appeal.

### III.  Subject Matter Jurisdiction Under the PMPA

At the outset, Sun Oil challenges the district court's conclusion that it possessed subject matter jurisdiction over this case. The district court concluded that Congress contemplated

---

[4] The jury concluded that Seahorse was damaged in the amount of $3 million, but that Seahorse had failed to mitigate $500,000 of those damages.

-7-

protection for distributors like Seahorse in contractual relationships with refiners like Sun Oil. We review that determination de novo, Bull HN Info. Sys., Inc. v. Hutson, 229 F.3d 321, 328 (1st Cir. 2000), and conclude that subject matter jurisdiction is present.

The PMPA is a remedial statute, and as such, "merits a relatively expansive construction," C.K. Smith & Co. v. Motiva Enters., 269 F.3d 70, 76 (1st Cir. 2001). We are mindful, however, that the statute is in derogation of common law rights, and therefore "should not be interpreted to reach beyond its original language and purpose." Id. (quoting Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc., 940 F.2d 744, 750 (1st Cir. 1991)).

With these principles in mind, we turn to the text of the statute, as the "starting point for interpretation of a statute is the language of the statute itself." Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990) (internal quotation marks omitted). We give effect to the statute's plain meaning "unless it would produce an absurd result or one manifestly at odds with the statute's intended effect," Parisi by Cooney v. Chater, 69 F.3d 614, 617 (1st Cir. 1995); see also United States v. Puerto Rico, 287 F.3d 212, 217 (1st Cir. 2002); Arnold v. United Parcel Serv., 136 F.3d 854, 857-58 (1st Cir. 1998), and we interpret the plain language "in light of the purposes Congress sought to serve." See Arnold, 136 F.3d at 858 (citing Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 118 (1983)). Under the PMPA,

> [t]he term "franchise" means any contract--
> (i) between a refiner and a distributor,

-8-

(ii) between a refiner and a retailer,
(iii) between a distributor and another distributor, or
(iv) between a distributor and a retailer,
under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

15 U.S.C. § 2801(1) (emphasis added).

"Motor fuel" is defined as "gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads and highways." 15 U.S.C. § 2801(12) (emphasis added). Building on those definitions, the PMPA next explains the prohibitions on motor fuel franchisors, with exceptions not relevant here:

[N]o franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may--
(1) terminate any franchise . . . prior to the conclusion of the term, or the expiration date, stated in the franchise; or
(2) fail to renew any franchise relationship . . . [without following the PMPA's requirements].

15 U.S.C. § 2802(a).

The parties contest whether Seahorse is engaged in the distribution of "motor fuel," as that phrase is contemplated under the PMPA. Sun Oil contends that the Act was meant to apply only to automotive filling stations or fuel actually used in motor vehicles and that applying the PMPA to a marine supplies distributor would impermissibly broaden its reach. But we must read the statute as written. The record reflects that Sun Oil distributed to Seahorse at least 40,000 barrels of diesel fuel monthly. Under the PMPA's definition of "motor fuel," the fuel at issue need only be "of a

-9-

type" for use by vehicles traversing land. In a sworn statement, Sun Oil's treasurer defined the diesel fuel Sun Oil distributed to Seahorse as that which "may be used in ships and vessels and by owners of chemical plants that have boilers, and also in trucks and vehicles" (emphasis added). Because the diesel fuel could have been used for land vehicles, the plain language of the statute covers the relationship at issue here.[5] Sun Oil effectively reads "of a type" out of the statute, but we are not at liberty to do that. We therefore refuse to legislate a requirement that franchisees prove that the fuel was actually used in a self-propelled land vehicle, instead of a boat, a lawnmower, or any other machine that uses motor fuel to run.

Sun Oil rests its contrary argument on two grounds. The first is that the district court, in defining "motor fuel," included that used by boats as well as trucks, and equated "the seas" with "public streets, roads and highways." In so doing, Sun Oil argues, the court improperly relied on the statute's broad remedial purpose and expanded the reach of the statute. As the preceding text indicates, our decision does not rest on this interpretation.

---

[5] Diesel fuel was only one of several types of fuel Sun Oil sold to Seahorse. However, the amount of diesel fuel was substantial in comparison to the other types. Under the September 1989 agreement, for example, Sun Oil agreed to sell to Seahorse on a monthly basis at least 40,000 barrels of diesel, 5,000 barrels of kerosene, and 15,000 barrels each of Nos. 5 and 6 fuel oil. Because diesel comprised more than half of the sales, our conclusion is not tantamount to the tail wagging the dog. We thus conclude that subject matter jurisdiction exists over the franchise agreement as a whole.

Sun Oil's second contention is that the PMPA's legislative history indicates that "the Act was designed to govern relationships involving automobiles, not ships." It refers to Senate Report No. 95-731, which accompanied the legislation resulting in the PMPA and the introductory language describing it, as providing for

> the protection of franchised distributors and retailers of motor fuel and to encourage conservation of automotive gasoline and competition in the marketing of such gasoline by requiring that information regarding the octane rating of automotive gasoline be disclosed to consumers . . . .

S. Rep. No. 95-731, at 1, reprinted in 1978 U.S.C.C.A.N. 873, 876 (1978) (hereinafter S. Rep. No. 95-731). The protection of franchised distributors was the purpose of Title I, which established "minimum Federal standards governing the termination . . . of franchise relationships for the sale of motor fuel. . . ." The requirements regarding gasoline octane ratings were the subject of Title II. This latter Title II reference to automotive gasoline, directed to information disclosure, is not comfortably transferred to Title I to effect a narrowing of the scope of franchise relationships. It may well be that the intervention of Congress was triggered by automotive gasoline franchise relationships. But does the historical origin of legislation trump its unambiguous language describing a broader reach? We think not unless such a literal construction would do violence to the basic policy underlying the statute.

The policy behind Title I was identified in Veracka v. Shell Oil Co., 655 F.3d 445, 448 (1st Cir. 1981), when then Judge Breyer

-11-

wrote: "The legislative history of the Marketing Act shows that its basic effort to prevent franchise termination reflects a recognition of the disparity of bargaining power between franchisor and franchisee and an effort to prevent coercive or unfair franchisor practice."

The Supreme Court has cautioned that "reference to legislative history is inappropriate when the text of the statute is unambiguous." Dep't of Hous. & Urban Dev. v. Rucker, 122 S. Ct. 1230, 1234 (2002). Indeed, "[w]hen a statute's text is encompassing, clear on its face, and productive of a plausible result, it is unnecessary to search for a different, contradictory meaning in the legislative record." Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 698 (1st Cir. 1994).

Even assuming that the statute could be considered ambiguous, we find no persuasive contrary signal in the legislative history. Of the PMPA's three titles, only Title I is germane here because it is the only one that governs termination of franchises. Its legislative history establishes that Congress passed the statute to remedy "the disparity of bargaining power" between franchisors and franchisees, S. Rep. No. 95-731, at 17, by "establish[ing] protection for franchisees [of motor fuel] from arbitrary or discriminatory termination or nonrenewal of their franchises." Id.

at 15.[6]  The relationship of Seahorse and Sun Oil comfortably fits within that statement of purpose.

Title II, by contrast, is obviously targeted at automotive gasoline, as opposed to the broader product, motor fuel.  Title II requires the testing, certification, and posting of octane ratings for automotive fuel to ensure consumers' ability to compare different types of gasoline.  Title II's legislative history is replete with references to cars and everyday consumers: "automotive gasoline," "gasoline," "gasoline retailer," "motorists," and "motor vehicles." Id. at §§ 19-21, 43-45.  The phrase "motor fuel" is not used at all.  That Title II repeatedly uses those terms, while Title I continually refers solely to "motor fuel," suggests that Congress sought broad protection for franchisees of motor fuel.[7]

In sum, we conclude that the relationship between Seahorse and Sun Oil fits within the plain language of the statute and the legislative history only buttresses that conclusion.  It is up to Congress to amend the PMPA's definitional section, and the courts may not usurp that authority.

---

[6]  To be sure, the legislative history includes as valid grounds for termination, a franchisor's withdrawal from a relevant geographic market area, S. Rep. No. 95-731, at 34, and "the repeated failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner." Id. at 35.  These isolated illustrations, even if construed to refer only to land-oriented operations, are part of a non-exclusive list of grounds for termination.

[7]  Title III adds nothing to our analysis.  Its only purpose is to direct the Secretary of Energy to study the practice of "subsidization of motor fuel marketing operations with funds or services derived from other petroleum-related operations." S. Rep. No. 95-731, at 16.

IV. <u>Jury Instructions</u>

We review jury instructions de novo, bearing in mind that the district court's "refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." <u>United States</u> v. <u>DeStefano</u>, 59 F.3d 1, 2 (1st Cir. 1995) (internal quotation marks omitted).

A. <u>Adequacy of Notice</u>

Sun Oil contends that the district court erred in refusing to instruct the jury on whether the company had given proper notice of termination "under the circumstances."  Although masked as a jury instruction challenge, Sun Oil's brief makes clear that this is actually a challenge to the pivotal pre-trial ruling that Sun Oil had not met the notice requirements of the PMPA.[8]  Under the law of the case doctrine, a party may not revisit a substantive ruling through this type of attack on a jury instruction. <u>See</u> <u>Nat'l Labor Relations Bd.</u> v. <u>Goodless Electric Co.</u>, 285 F.3d 102, 107 (1st Cir. 2002) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (quoting <u>Arizona</u> v. <u>California</u>, 460 U.S. 605, 618 (1983)).  Sun Oil's focus on the jury instruction, rather than on

---

[8]  Although Sun Oil devotes several pages of briefing to this challenge, it neither recites nor points us to the specific contested instruction.  That omission reinforces the transparency of its jury instruction challenge.

the district court's underlying conclusion, is perplexing. Nevertheless, we will indulge the argument.

Sun Oil contends that its February 17, 1992 letter met the notice provisions "under the circumstances" because Seahorse had actual notice of the particulars required by the Act. That letter states in full:

> Even though our Supply Agreement expired on September 14, 1990 and we agreed to continue supplying fuel to you under its terms through [M]arch 15, 1991, Seahorse continues to use in its operations our trademark and trade name.
>
> We are hereby requiring you to discontinue using our trademark and trade name to promote your business and we would expect that you immediately honor our request.

The PMPA contemplates strict notice for termination or nonrenewal of a motor fuel franchise:

> (a) **General requirements applicable to franchisor**
> Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship--
> > (1) in the manner described in subsection (c) of this section; and
> > (2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.
> (b) **Additional requirements applicable to franchisor**
> > (1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section--
> > > (A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable[.] * * *
> (c) **Manner and form of notification**
> Notification under this section--

(1) shall be in writing;
(2) shall be posted by certified mail or personally delivered to the franchisee; and
(3) shall contain--
    (A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;
    (B) the date on which such termination or nonrenewal takes effect; and
    (C) the summary statement [of available remedies and relief prepared by the Secretary of Energy].

15 U.S.C. § 2804.

The PMPA's notice provisions mandate strict compliance and thus cannot be selectively followed by the franchisor. See 15 U.S.C. § 2804(a) ("[T]he franchisor shall furnish notification . . . ."); S. Rep. No. 95-731, at 39 ("[N]otification . . . must be provided . . . .") (emphasis added in both); see also Thompson v. Kerr-McGee Refining Corp., 660 F.2d 1380, 1390 (10th Cir. 1981) (mandating strict compliance). But cf. Avramidis v. Arco Petroleum Prods. Co., 798 F.2d 12, 17 (1st Cir. 1986) (declining to require strict notice of specific date of termination where the franchisees transformed a definite termination date into a later unspecified date by securing a preliminary injunction). Our precedent, which tempers strict compliance only for the most trivial of departures, is consistent with the notice provisions' underlying purpose of protecting franchisees from arbitrary or unanticipated terminations. Failure to follow the rules leaves the franchisee without clear notice.

Sun Oil concedes that the February 17 letter did not "expressly notify Seahorse of the reasons for termination," and

that the company neither personally delivered that letter nor sent it via certified mail. The letter also did not contain the summary statement, though Sun Oil seems to argue that its prior provision of the statement to Seahorse at the end of the trial franchise agreement obviated its duty to provide it again. In short, section 2804(c) contains five specific requirements. Three of the five were not met. Only the requirements of a writing and that of a date of termination ("immediately") could be said to have been met.

Sun Oil posits that imposing a strict notice requirement would elevate form over substance because Seahorse was already on notice as to why Sun Oil intended to terminate the relationship. The critical flaw in this argument is that, despite Sun Oil's past complaints to Seahorse (e.g., about nonpayment and overextension of credit), its continuing relationship with Seahorse led to the permissible inference that Sun Oil did not consider any of Seahorse's transgressions grounds for termination.[9] There is a stark difference between complaints by one of the parties in a long-term business relationship and that party's intent to terminate the relationship. Even if Seahorse was delinquent, it justifiably relied on Sun Oil's inaction.

---

[9] For example, Sun Oil points to a letter it sent to Seahorse regarding checks that had been returned for insufficient funds. Nothing in the January 1992 letter suggests that Sun Oil considered the violation to be critical to the continuance of the business relationship. Indeed, the letter concludes: "We would appreciate if you contact your bank and resolve this issue today. It is over a week that these checks were returned by the bank and not replaced."

A review of the caselaw on which Sun Oil relies further confirms the weakness of its position. As discussed supra, Sun Oil's February 17 letter failed in multiple respects to comply with the PMPA's notice requirements. In asserting that its prior interactions with Seahorse amounted to a de facto notice of its intent to terminate the relationship, Sun Oil cites numerous district court cases that dealt only with a franchisor's failure to include the Secretary of Energy's summary statement of available remedies from the Federal Register. See, e.g., Shell Oil Co. v. A.Z. Servs. Inc., 990 F. Supp. 1406, 1416 (S.D. Fla. 1997) (failure to include summary statement did not render notice invalid); Grotemeyer v. Lake Shore Petro Corp., 749 F. Supp. 883, 889 (N.D. Ill. 1990) (same); Martin v. Texaco, Inc., 602 F. Supp. 60, 63 (N.D. Fla. 1985) (concluding that the jury had to determine whether a franchisor's failure to include the summary statement deprived the franchisee of notice as contemplated by the PMPA); Brown v. Magness Co., 617 F. Supp. 571, 574 (S.D. Tex. 1985) (no inadequate notice for failure to attach summary statement and for delivering notice to the franchisee's attorney, rather than the franchisee).

Sun Oil's other cited cases are simply inapposite. In Brown v. American Petrofina Mktg., 555 F. Supp. 1327, 1335 (M.D. Fla. 1983), the court noted "the very close question" of whether actual notice can trump PMPA notice but declined to resolve the issue. In Frisard v. Texaco, Inc., 460 F. Supp. 1094 (E.D. La. 1978), decided soon after the PMPA's passage but before the summary statement was published in the Federal Register, the court dealt with nearly

-18-

perfect compliance. In that case, the notice was in "writing, posted by certified mail, stated both the intention not to renew as well as the effective date of nonrenewal, cited the . . . reason for nonrenewal, and referred to the future receipt of the summary statement. . . . [The] letter was not only timely, but complied with the PMPA in all respects." Id. at 1100 (emphasis added).

Similarly, Desfosses v. Wallace Energy, Inc., 836 F.2d 22 (1st Cir. 1987), the only First Circuit case cited by appellant, is easily distinguishable. In Desfosses, the franchisee argued that the franchisor failed to comply with section 2802(c)(4) (a section inapplicable here) by failing to notify the franchisee of the requirements of an underlying lease for the franchisee's property. Although we suggested that in certain circumstances actual knowledge of a franchisor's reasons for termination might trump strict compliance, we concluded that the franchisor had, in fact, given proper notice under section 2802(c)(4). Id. at 27.

We conclude that the district court's refusal to instruct the jury on whether Sun Oil had given proper notice "under the circumstances" was correct as a matter of law. The evidence plainly shows that Sun Oil failed to follow the strictures of the PMPA's notice requirements, even if they were read broadly. Accordingly, we find no merit to this jury instruction challenge.

B. Grounds for Termination

Sun Oil contests the district court's refusal to instruct the jury on whether the company had sufficient grounds to terminate the franchise under the PMPA. Sun Oil did not specifically point to

the contested instruction, but we assume that it is proposed instruction number eighteen, entitled "PMPA - Grounds for Termination."

As an initial matter, Sun Oil did not adequately preserve its objection to this instruction.  Rule 51 of the Federal Rules of Civil Procedure states that an objection to a jury instruction is waived unless the party "stat[es] distinctly the matter objected to and the grounds of the objection."  Fed. R. Civ. P. 51.  Here, the entire objection stated:

> With respect to proposed [instructions] 14, 15, 16, 17, 18, and 19, . . . [w]e contend that the instructions should be charged to the jury because they correctly state the elements of the claims and defenses available under the law purportedly applicable to this case.
>
> We further contend that the failure to instruct the jury in this fashion, based on the Court's pre-trial rulings . . . is incorrect because it precludes defendant from challenging in the trial of this case the Court's finding that the only issues to be tried were whether Seahorse abandoned the relationship with [Sun Oil] or whether [Sun Oil] terminated the relationship and the damages caused to the plaintiff in the case of a termination or nonrenewal.
>
> So [] stated, the issues preclude[] trying the issue as to whether the PMPA was even implicated in this case by finding as proven that the fuel sold by defendant to plaintiff in the relationship was motor fuel despite the definition provided in the PMPA.  That even if Seahorse failed to comply with provisions of the alleged franchise and caused events relevant to the relationship . . . as a result of which termination or nonrenewal of the franchise was reasonable, that [Sun Oil] did not provide sufficient notice under the act to rely on those breaches and events to preclude liability.

The first two paragraphs include boilerplate language that only restates the district court's framing of the case and does not go to the substance of the contested instructions.  And the oblique nature of the third paragraph certainly fails to "state distinctly

-20-

the matter objected to," as required by Rule 51.  We thus conclude that the objection does not meet Rule 51's standard, and we review only for plain error.  Under that standard, Sun Oil must prove "(1)  that there was error, (2) that it was plain, (3) that it likely altered the outcome, and (4) that it was sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial proceeding." Gray v. Genlyte Group, 289 F.3d 128, 134 (1st Cir. 2002) (quoting United States v. Olano, 507 U.S. 725, 735-36 (1993)).

The court rejected the instruction as inconsistent with its pre-trial ruling that liability would attach if the jury found a termination, regardless of the grounds, because of the inadequate notice.  Although the grounds for termination could have been relevant to the jury's assessment of damages, by indicating the reasonable period of time for future lost profits, the actual language of the instruction makes clear that it was yet another attempt to ask the jury to re-assess the district court's pre-trial rulings on liability.  The district court's refusal to instruct the jury in this vein was correct as a matter of law.

### V. Expert Testimony of Heidie Calero

Sun Oil next argues that Seahorse's damages expert, Heidie Calero, proffered inherently unreliable evidence that should have been excluded by the district court under its Daubert/Kumho Tire gatekeeping function.  See Kumho Tire, 526 U.S. at 141; Daubert, 509 U.S. at 592-93.

-21-

Rule 702 of the Federal Rules of Evidence provides the backdrop for any consideration of expert testimony. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The Supreme Court's decisions in Kumho Tire and Daubert guide a district court in determining how to assess the admissibility of such expert testimony. Pursuant to Daubert, the district court must perform a gatekeeping function by preliminarily assessing "whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. Several factors may assist the district court in making its determination: whether the theory/technique can be and has been tested; whether it has been subjected to peer review and publication; the known or potential rate of error; and the level of the theory/technique's acceptance within the relevant scientific community. Id. at 593-94. Although the approach is flexible by its nature (after all, expert testimony and the peculiar facts of each case so demand), the overarching concern is on the "evidentiary relevance and reliability" of the proposed testimony. Id. at 595.

In Kumho Tire, the Court extended its holding in Daubert and held that the gatekeeping function applies to technical and other specialized knowledge in addition to scientific testimony. Kumho Tire, 526 U.S. at 141. The Court stressed that the district court must have "considerable leeway" in both "how to determine reliability" and "its ultimate conclusion." Id. at 152-53. The ultimate credibility determination and the testimony's accorded weight are in the jury's province. See Mitchell v. United States, 141 F.3d 8, 16-17 (1st Cir. 1998). With these general principles in mind, we now consider whether the district court abused its discretion in admitting Calero's testimony. See Kumho Tire, 526 U.S. at 152 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 138-39 (1997)).

A.    The tax calculations

Sun Oil first contends that Calero's testimony should have been excluded because her damages calculation was flawed. According to Sun Oil, Calero neglected to take into account Seahorse's failure to pay various taxes. It argues that if Seahorse had properly accounted for its tax obligations, its profits (and thus, damages) would have been minimal at best. Sun Oil inexplicably neither pinpoints the disputed testimony nor discusses the actual figures that allegedly would have undercut Calero's testimony. Our review of Calero's testimony provides no support for Sun Oil's claim: Calero testified that she considered the provisions of Seahorse's tax exemption decree in conjunction

-23-

with its historical sales.[10]  From that analysis, Calero concluded that approximately fifty percent of the sales were for tax exempt vessels,[11] and that the remainder of the sales would require an assessment of forty-two percent, the normal tax rate.  Calero used those figures to conclude that, even with its tax obligations, Seahorse would have carried a profit in each of fiscal years 1992 through 1996.

Given Calero's plain testimony and Sun Oil's failure to meaningfully point out any discrepancy in the record, we cannot conclude that the district court abused its discretion in allowing Calero's testimony.  Moreover, to the extent that Sun Oil sought to prove that Calero's tax calculations were flawed, it followed the proper course of action by rebutting that testimony with its own expert.  See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  The well known adage that reasonable people can disagree applies here full force.  That the jury found in Seahorse's favor does not mean that the district court erred in admitting the testimony.

---

[10]  Calero reviewed more than 16,000 daily invoices over a period of three years to assess Seahorse's average tax exempt sales.

[11]  According to Calero's testimony, the vessels were only ninety percent tax exempt, leaving a ten percent tax liability.

-24-

B.     Future Damages

Calero's forecast of damages over a ten-year period, however, is more troublesome.  Sun Oil contends that the ten-year period was overly speculative because the initial agreement was for only a one-year period, the longest renewal period was for four months, and the entire PMPA relationship lasted only two and one-half years.  It further maintains that due to Seahorse's misconduct, there was no reasonable basis to believe that the agreement would extend so far into the future.  See, e.g., Irvine v. Murad Skin Research Labs., 194 F.3d 313, 321 (1st Cir. 1999) ("Absent adequate factual data to support the expert's conclusions his testimony was unreliable."); Wallace Motor Sales, Inc. v. American Motor Sales, 780 F.2d 1049, 1062 (1st Cir. 1985) ("[T]here is a distinction between proof which allows the jury to make a 'just and reasonable inference' of damages and proof which only provides a basis for 'pure speculation or guesswork.'") (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946)); see also Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 22 (2d Cir. 1996) ("Admission of expert testimony based on speculative assumptions is an abuse of discretion.").

We need not decide whether this time period was unduly speculative. Given the jury's ultimate award, the district court's admission of Calero's testimony would have been harmless error at best.  The jury evidently grasped the disparity between Calero's long-term forecast of $10.7 million and the reality of Seahorse's situation, and discounted Calero's forecast accordingly by awarding

-25-

only $800,000 in lost profits and $2.2 million in going concern damages.[12]  Indeed, the jury's award not only fell far short of the ten-year estimate, but of the five-year estimate and that of the four years following the close of Seahorse's operations as well.  Therefore, although the district court may have erred by allowing Calero to forecast for ten years, it would have been only harmless error, and is therefore not a basis for granting a new trial.  The district court did not err in admitting the balance of Calero's testimony because Calero took into account Seahorse's historical performance, in conjunction with the performance of others in the industry and the overall Puerto Rico economy, in calculating Seahorse's damages.[13]

## VI. Denial of Motion for New Trial

A district court's refusal to grant a new trial is reviewed only for manifest abuse of discretion.  See Diefenbach v. Sheridan

---

[12]  As noted above, the jury concluded that Seahorse failed to mitigate $500,000 of its damages.

[13]  We also reject Sun Oil's argument that Calero relied on erroneous assumptions in calculating damages.  According to Sun Oil, Calero assumed that Sun Oil was obligated to give Seahorse preferential fuel prices and that Seahorse was the only distributor that was allowed to use the Sun Oil logo and trademark. Calero testified, however, that her estimate of damages relied neither on a finding that Seahorse was entitled to the lowest price nor that Seahorse was Sun Oil's exclusive distributor.

Sun Oil also challenges Calero's damage calculations for fiscal year 1991-92.  The company provided neither meaningful record references nor caselaw in support of this argument, and it therefore is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

<u>Transp.</u>, 229 F.3d 27, 32 (1st Cir. 2000); <u>United States</u> v. <u>Dumas</u>, 207 F.3d 11, 14 (1st Cir. 2000). The court may order a new trial only "if the verdict is so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." <u>Cigna Fire Underwriters Co.</u> v. <u>MacDonald & Johnson</u>, 86 F.3d 1260, 1263 (1st Cir. 1996). Sun Oil challenges both the liability and damages findings of the jury. We cannot find merit in either challenge.

A.   <u>Liability</u>

The first question the jury faced was whether Sun Oil terminated, or Seahorse voluntarily abandoned, the franchise relationship. Seahorse's theory was that Sun Oil's unilateral change in pricing structure and subsequent actions, culminating in Sun Oil's February 17, 1992 letter, amounted to an illegal termination. Sun Oil attacks the jury finding of termination by arguing that the evidence shows that it had grounds to terminate its relationship with Seahorse, and that, in any event, Seahorse's mismanagement and failure to adjust to changing market conditions forced it to abandon its relationship with Sun Oil in January, 1992.

Sun Oil argues that the evidence overwhelmingly demonstrated that Seahorse's failure to respond to the volatile oil market and to the change in pricing structure forced the franchisee to voluntarily abandon the relationship. Sun Oil cites to Seahorse's "Analisis de Venta Isla y Barcos" -- its invoice/sales register -- to argue that Seahorse's fuel sales actually increased during the two months after the new pricing structure went into effect. Sun

-27-

Oil thus argues that the jury had no basis for concluding that the change in pricing formula brought on Seahorse's eventual demise; instead, the only conclusion permitted by the evidence is that Seahorse's problems were fully attributable to Seahorse's own mismanagement.

The jury heard evidence, however, that the change in pricing formula caused irreparable harm. Seahorse elicited testimony that Sun Oil set out to destroy Seahorse's business by denying Seahorse the benefit of weekly price protection, while offering it to Seahorse's customers. Thus, Seahorse's customers began purchasing directly from Sun Oil at more favorable prices. This, Seahorse argues, led to its decline and eventual demise. Moreover, although Seahorse's sales had increased for two months after the pricing structure change, the overall sales during that period had dropped markedly from the prior year.

Having reviewed the evidence, we cannot say that the district court abused its discretion in refusing to grant a new trial on liability. The evidence established that the jury reasonably could have concluded that beginning with the change in pricing structure, and continuing with its refusal to allow Seahorse to purchase fuel on credit, Sun Oil took steps to end its relationship with Seahorse, without following the PMPA's requirements.

B.    Damages

Sun Oil also disputes the district court's refusal to grant a new trial on damages, arguing that Seahorse failed to establish through reliable, non-speculative evidence, that Sun Oil caused it

to suffer any damages. First, Sun Oil says that there was no evidence that Seahorse was profitable. We have already concluded that Seahorse's expert, Heidie Calero, presented admissible evidence of Seahorse's profits. Sun Oil contested that evidence with testimony from its own expert, Carlos Baralt, who testified that Seahorse would not have been profitable under his assessment of Seahorse's various tax obligations. The jury's award of only a fraction of Calero's estimate confirms that the jury took into account the testimony of both experts in making its determination.[14]

Lastly, Sun Oil asserts that the damages award is not supported by the evidence because Seahorse's financial records contained some incorrect data. Specifically, it challenges the reliability of Seahorse's Analisis de Venta Isla y Barcos. Sun Oil does not explain the alleged deficiencies, but Seahorse asserts that Sun Oil's claim rests on the incorrectness or absence of approximately 170 of the Analisis's 11,000 transactions. At trial, after Seahorse was alerted to the missing transactions, Calero recalculated the damages and lowered her estimate by $600,000. Sun Oil did not respond to this argument in its reply brief. It seems to us that Calero's recalculation corrected any supposed deficiencies in the initial assessment of the records.

---

[14] Also, Sun Oil argues that the damages were speculative because there was no evidence that the relationship would have lasted as long as Calero had estimated. As we already have concluded, however, Calero's long-term forecast was inconsequential because the jury clearly did not adopt it.

## VII. Seahorse's Mitigation of Damages

Finally, we turn to Seahorse's cross-appeal, in which it contends that the district court erred in denying its motion to amend or alter judgment regarding its failure to mitigate damages. As the district court noted, Seahorse's motion was technically a renewed motion for judgment after trial under Fed. R. Civ. P. 50(b). The district court's denial of a Rule 50(b) motion must be sustained "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." PH Group Ltd. v. Birch, 985 F.2d 649, 653 (1st Cir. 1993). Seahorse cannot meet that high burden.[15]

Seahorse first contends that Sun Oil never meaningfully presented the mitigation of damages defense, and thus waived it. The record, however, shows otherwise. Sun Oil initially raised Seahorse's failure to mitigate damages as an affirmative defense in its answer to the complaint, and again raised it in the parties' proposed pre-trial order. At trial, Sun Oil questioned Alberto Dapena, Seahorse's president, as to various alternatives Seahorse could have taken to stave off Seahorse's close of operations. We

---

[15] Sun Oil asserts that Seahorse has waived its mitigation claim because it did not object to the jury instruction regarding mitigation of damages immediately after the jury was charged, as required by Fed. R. Civ. P. 51. Seahorse points out, however, that the challenge was not only to the jury instruction, but also to the district court's ultimate finding under Fed. R. Civ. P. 50 that there was sufficient evidence to sustain the jury's finding. Because we conclude that the mitigation award was adequately supported by the evidence, we do not consider whether Seahorse waived its right to appeal.

thus conclude that Sun Oil pressed this argument before and during trial.

As to the substance of its argument, Seahorse points to Dapena's testimony that after Sun Oil changed the pricing formula, he attempted to locate other fuel suppliers to ensure Seahorse's continued operation. Dapena also requested that Sun Oil release part of a letter of credit that it held so that Seahorse would be able to buy fuel from other suppliers. Finally, Seahorse asserts, it continued to sell Sun Oil's fuel until Sun Oil terminated that right in the February 17 letter.

Notwithstanding Dapena's actions, we agree with Sun Oil that it presented sufficient evidence to sustain the jury's mitigation finding. On cross-examination, Sun Oil questioned Dapena about a February 28, 1992 memorandum he had written to Seahorse's board of directors, in which he placed the blame for Seahorse's demise squarely on Sun Oil. In that writing, Dapena proposed that a number of alternatives were available to Seahorse to limit its damages. On cross examination, Sun Oil garnered that Seahorse chose not to take action on them. For example, Seahorse could have temporarily closed the company in order to reorganize or could have filed for bankruptcy, with or without intent to resume operations at a later time. We thus conclude that the district court did not err in leaving intact the jury's determination that Seahorse failed to mitigate its damages.

    Affirmed. Seahorse to recover one half of its costs.

-31-